12 317
62 205

## KENNEDY and others *against* SCOVIL and another.

In *June*, 1832, and before, *B* owned two pieces of land, with a stream of water running through them, on each of which he had a mill, propelled by the water of such stream. On the upper piece he had a dam, mill-pond, flume and conductor. The water for the use of both mills, passed from the dam through the flume. That for the use of the upper mill was taken from the flume, by means of two orifices in it ; and that for the use of the lower mill,

*Middlesex,*
*July, 1837.*

Kennedy
*v.*
Scovil.

by means of a conductor inserted in the flume, and extending from it to the mill. On the 8th of *June*, 1832, *B* conveyed to *S* the upper mill site and one half of the pond flowed by the dam, by a deed containing the following clause : " always provided, and this deed is given on condition, that the grantor is to have and retain the privilege. of conveying water from said dam through a conductor similar to the one now in use, till the same shall arrive at the *East end of the new shop,* [the upper mill] and thence, either by a conductor, race or otherwise, to the shop [lower mill] lying *East* of the new shop." The rights of *B* in the lower mill, afterwards became vested in *K* and *S ; K* owning two thirds, and *S* one third. In *November*, 1835, *S* made a new orifice in the flume, lower than any former one, and thereby drew off so much of the water as not to leave sufficient to keep the lower mill in operation. On a bill in chancery brought by *K* against *S*, to enjoin him against such diversion, it was held, 1. That *B*, at the time of the conveyance from him to *S*, had a right and was bound to take the water for the use of the lower mill, in the accustomed manner, and that, by such conveyance, *B* retained to that mill all the privileges which it then enjoyed ; 2. that the term " dam" in the reservation, was to be construed as including the flume, or as being of equivalent import; 3. that though the reservation was without words of inheritance and without mention of assigns, yet *B*, after the conveyance to *S*, had an *assignable* interest in the use of the water reserved ; 4. that notwithstanding *K* and *S* were tenants in common of the lower mill and the water privilege connected with it, yet as the acts complained of tended to a destruction of the joint property, *K* was entitled to the relief sought.

THIS was a bill in chancery for an injunction against the defendants.

On the 8th of *December*, 1836, the time of filing the plaintiffs' bill, they, as tenants in common with *Hezekiah Scovil*, one of the defendants, were owners of a certain piece of land in the town of *Haddam*, containing about one acre, and of a mill or manufactory and water privilege thereon ; the plaintiffs owning two thirds and *Scovil* one third. Adjoining to this on the *West*, and higher on the stream, was another piece of land containing about half an acre, owned by the defendants, on which they had a mill or manufactory. They were also the owners of one half of the pond attached thereto, and of the water therein ; and the other half belonged to the plaintiffs.

On the 8th of *June*, 1832, *Giles Brainard* and *Hiram Woodruff*, who were then owners of both pieces of land and of the water privileges thereon, and who had erected on the land now owned by the defendants, a mill, with a dam, mill-pond, flume and conductor, conveyed two fifth parts of the last-mentioned real estate, and two fifth parts of one half of

the water privileges, to the defendant *Scovil*, and one fifth part of such premises to *William P. Allison*, the other defendant. The deeds by which these conveyances were made, after describing the land, proceeded thus : " Together with two fifths of the coal-house and of the work-shop thereon standing, with two fifths of all the machinery thereon and therein being, and two fifths of all other privileges and appurtenances thereunto belonging ; together with two fifths of one half of the pond flowed by the dam, and two fifths of one half of the privilege of flowing said pond. Always provided, that this deed is given on condition that the grantors are to have and retain the privilege of conveying water from said dam through a conductor similar to the one now in use, till the same shall arrive at the *East* end of the new shop, and thence, either by a conductor, race or otherwise, to the old shop lying *East* of the new shop, for the necessary accommodation and use of the old shop." The defendants went immediately into possession of their interests thus conveyed, and have continued to occupy them until this time. They carried on the business of the mill in partnership with *Brainard* and *Woodruff*, under articles of agreement executed simultaneously with the deeds, until the 14th of *January*, 1834 ; and during this period, *Brainard* and *Woodruff*, with one *Cornelius Brainard*, carried on the lower mill, now belonging the plaintiffs and *Scovil*, as a distinct and separate concern. During this period, *Woodruff* would frequently request *Allison*, who had charge of the upper mill, to shut the gates of that mill, and let the water pass through the conductor to the lower mill ; with which request *Allison* always complied ; and never until some time in 1835, did the defendants claim a right to use the water in the flume as they pleased. On the 14th of *January*, 1834, *Giles Brainard* and *Woodruff*, by deed of that date, conveyed to *Cornelius Brainard* 3d, " one undivided third part of the buildings, tools and water privileges, which said *Brainard* and *Woodruff* are now possessed of in the two *Eastern* factories or work-shops in said *Haddam*, as now used and improved in said buildings, and the same right in any other privilege thereto belonging, with the understanding that the dam is to be raised no higher than it has been in years past." On the 18th of *June*, 1836, *Woodruff*, by deed of that date, quit-claimed to *Cornelius Brainard* 3d, all his right in the lower mill and the premises connected

*Middlesex*,
July, 1837.

Kennedy
*v.*
Scovil.

with it ; and these interests so vested in him, were, on the 18th of *June,* 1836, fully vested in the plaintiffs. On the 12th of *January,* 1834, *Giles Brainard* mortgaged to *William Brainard* his one third part in the lower mill ; and on the 18th of *June,* 1836, the mortgage debt, with the premises, were duly assigned and transferred to the plaintiffs. On the 13th of *February,* 1834, *Woodruff* conveyed his remaining interest in the upper mill to *Scovil ;* and on the same day, he also conveyed to *Scovil* his remaining interest in the lower mill. On the 14th of *February,* 1834, *Giles Brainard* conveyed to *Scovil* all his interest in the upper mill.

When the upper mill and flume were first made, which was before the 8th of *June,* 1832, there were made in the flume, and leading from it, two large orifices for water to pass from it to the mill of the defendants ; one of them, for a wheel which moved a trip-hammer, lower than the mouth of the conductor of the plaintiffs' mill ; and the other, for a bellows-wheel, higher up in the flume than the mouth of such conductor. But notwithstanding these two orifices, the water from the stream and pond needed for the lower mill would pass through the flume into the conductor, and thence to such mill, and keep it in operation, at all times when there was sufficient water for both mills.

On the first of *November,* 1835, the defendants, without the consent of the plaintiffs, lowered in the flume the last-mentioned orifice about five feet, making it three feet lower than the mouth of the conductor, so that at all times afterwards, when there was not sufficient water in the pond and flume for both of the mills, the whole of it was drawn off by the defendants, at their upper mill. For some months before and on the 8th of *December,* 1836, there was in the stream and pond water enough to keep the plaintiffs' mill in operation, during the usual working hours of each day ; and during the whole of this time, the plaintiffs needed all the water for the use and operation of their lower mill. This was well known to the defendants ; and the plaintiffs, at divers times, and especially on the 10th of *August* and the 8th of *December,* 1836, particularly informed the defendants, that they needed the water, and requested the defendants to shut the gates to their orifices, and permit it to flow on through the flume and conductor to the lower mill ; but the defendants then, and at all times since,

*Middlesex,*
July, 1837.

Kennedy
*v.*
Scovil.

refused so to do; and they continue to use almost the whole of the water, so that the plaintiffs, during said period, have not been able to operate their mill more than a very small part of each day, and upon an average, not more than three hours and seventeen minutes a day, and for many days at a time, not at all.

The defendants have never denied the right of the plaintiffs to take one half of the water from the pond; but have denied that the plaintiffs have any right of priority in the use of the water; and have also denied the right of the plaintiffs to use the flume and conductor to convey the water from the pond to the lower mill, and claimed that the plaintiffs should take the water directly from the dam.

In dry seasons, the water of the pond is not sufficient to carry the machinery of both the mills, without interruption. The work done at the upper mill is the same in kind as that done while *Brainard* and *Woodruff* were part owners and in partnership. No measures have ever been adopted to equalise the use of the water, between the two mills; nor have the plaintiffs ever attempted to draw the water from the pond, in any other manner than through the flume and the conductor.

The case was reserved for the advice of this court, as to what decree should be passed thereon.

*W. W. Ellsworth* and *Clark*, for the plaintiffs, contended, 1. That as the plaintiffs are, *ex concessis*, entitled to half the water, and the defendants have refused to let them have so much as that, this bill is sustainable. *Gardner* v. *Trustees of Newburgh*, 2 *Johns. Ch. Rep.* 162.

2. That the plaintiffs are entitled, by the reservation in the deeds of their grantors, to the whole of the water, except the surplus—*i. e.* those grantors reserved the privilege of conveying so much water from the dam, through a conductor similar to the one then in use, as was necessary for the accommodation and use of their mill. The construction of the deeds is not equivocal; but if it were, the use of the flume and conductor since 1832, is decisive as to the meaning of the parties. No such right as is now claimed by the defendants was ever after that time pretended, until 1835; but the upper mill took only the surplus water. *Livingston* v. *Ten Broeck*, 16 *Johns. Rep.* 234. *Phil. Ev.* 119, 120.

*Middlesex,*
July, 1837.

Kennedy
*v.*
Scovil.

3. That the words in the deeds qualifying the conveyance, did not make it a mere personal licence. In the first place, it is certain that the lower mill is to be *continued ;* and yet its whole value consists in its water privilege. Now, can it be, that while the right to the water continues, (except the surplus) this water power is to be regarded as a personal licence, so that the owners of the lower mill may use all the water themselves, but cannot lease the mill to others, nor, even in case of sickness, put an agent there ? Secondly, the word "privilege," which is relied upon, by the defendants, as favouring their construction, is used, in all these deeds, to convey an *interest*, and a *freehold interest* too. In selling water power, it is the legal and common mode of conveying an absolute and unlimited interest in the subject. Thirdly, that the reservation or exception is to "the grantors," does not make it a personal licence. The language is, they are "to *have* and *retain*"—*i. e.* notwithstanding this deed, they are still to *have* and *retain* the thing specified. This thing is not granted ; it is taken out of the deed ; and the whole interest in it remains as it was before the deed was given. Thus, a deed of a farm, reserving to the grantor a certain lot of five acres, excepts the fee of that lot. *Co. Litt.* 47. *a.* *Com. Dig. tit.* Fait. E. 5. *Cudlip* v. *Rundall*, 4 *Mod.* 11, 12.

4. That the right of the plaintiffs being established, while it exists, a court of chancery will make it *effectual*, by a decree adapted to that purpose. An injunction is appropriate.

*Hungerford*, for the defendants, contended, 1. That the plaintiffs had no right to draw any water from the *flume* connected with the defendants' mill, for the use of the old mill, but from the *dam* only.

2. That the qualifying words in the deeds had not the requisites of an *exception*, but constituted strictly a *reservation ;* and the reservation being to the grantors *Brainard* and *Woodruff* alone, they had no right to *assign* the privilege reserved. The words of the reservation being the words of the grantors, are to be construed favourable for the grantees, and against the grantors. *Marshall* & al. v. *Niles* & al. 8 *Conn. Rep.* 369. *Bullen* v. *Deming*, 5 *Barn. & Cres.* 842. (12 *Serg. & Lowb.* 383.) *Earl of Cardigan* v. *Armitage*, 2 *Barn. & Cres.* 197. (9 *Serg. & Lowb.* 63.) *Shep. Touch.* 77.

3. That admitting that *Brainard* and *Woodruff* had an assignable interest in the privilege reserved, the *Eastern* establishment is not entitled to a priority in respect to water, over the *Western* one.

4. That an injunction will not be granted against *Scovil*, who is tenant in common with the plaintiffs.

BISSELL, J.   The questions of law growing out of the facts found by the court and reserved for our advice, arise principally upon the deed of the 8th of *June*, 1832, and the circumstances connected with that conveyance.   That clause in the instrument, which is most intimately connected with the questions now before us, and to which our attention has been particularly directed, is in these words:—"Always provided, and this deed is given on condition, that the grantors are to have and retain the privilege of conveying water *from said dam*, through a conductor, similar to the one now in use, till the same shall arrive at the *East* end of the new shop aforesaid, and thence, either by a conductor, race or otherwise, to the old shop, *East* of the new shop, *for the necessary accommodation and use of the old shop*."   Upon this conveyance, and the facts found in the case, it is objected, that the present bill cannot be sustained, for the following reasons.

1.  It is said, that under the above reservation in their deed, *Brainard* and *Woodruff* had no right to take water from the flume for the use of the lower mill.

2.  Admitting they had the right, yet it was personal to them, and not assignable.

3.  Allowing them to have had an assignable interest, it is still insisted, that the plaintiffs are not entitled to an injunction, because they are tenants in common with *Scovil*, one of the defendants, of the lower mill, and of the privilege in controversy.

These several objections will be considered in their order.

1.  And in regard to the first, it may here be remarked, that the right of *Brainard* and *Woodruff* to one half of the dam and pond, is wholly independent of the reservation in their deed.   They were owners of the whole; and they never conveyed but a moiety for the use of the upper mill.   Of the other moiety they, of course, remained owners; and had an undoubted right to one half of the water, to be taken, *in some way*, from the pond.   The question, then, is narrowed down to

*Middlesex,*
July, 1837.

Kennedy
*v.*
Scovil,

this : whether, by reason of the reservation in their deed, *or otherwise,* they had a right to take the water *through the flume ?* Suppose there had been *no reservation in their deed ;* how then would have stood the right ? It is found in the case, that when the upper mill and flume were erected, and at all times before the 8th of *June,* 1832, the water for the use of the lower mill was taken from the flume, by means of a conductor therefrom, in the manner, and of the character, and for the purposes stated in the bill, and so continued until the acts complained of, were committed, by the defendants. Such was the manner in which the water for the use of the lower mill, was taken, when the conveyance in question was made. The grantors still retained the right to take a moiety of the water, for the use of that establishment. In what mode was it to be taken ? Would not the law imply, that it was to be taken in the mode in which it always had been taken ? And would the grantors have had a right to resort to any other mode ? Would they have had a right to erect a new flume ? It seems to us, that they would not; but that, *in the absence of any* stipulation, as to the mode, the irresistible inference would have been, that they not only had the right, but were obliged to take the water in the accustomed manner.

Does, then, the language of the reservation in the deed, vary the case ? What did the parties intend, by the reservation, is the question : and for the purpose of ascertaining that intention, it is proper to take into consideration the condition of the property, and the circumstances of the parties in relation thereto. *Strong* v. *Benedict,* 5 *Conn. Rep.* 210. 1 *Phil. Ev.* 417. and the cases cited in the note.

It is very obvious, that it was not the intention of the grantors to divest themselves of any privilege appertaining to the lower mill, of which they still retained the exclusive ownership. It was not necessary for them to stipulate, that the lower mill should have the privilege of a moiety of the water, or that it should receive it in the usual mode ; for both these privileges it would have had, without any stipulation. And it surely was not the intention of the parties, that the reservation should work a prejudice to the existing right of the grantors. They are to have *and retain* the privilege of conveying water to the lower mill, in the mode specified, *for its necessary accommodation and use.* This language would certainly seem to imply

very strongly, that some additional benefit was intended, to the lower mill; and that, in times of scarcity, it should enjoy a priority in the use of the water. But however this may be, it is very clear, that the grantors meant to *retain* to that mill, all the privileges which it then enjoyed.

*Middlesex*,
July, 1837.

Kennedy
*v.*
Scovil.

But it is said, that by the terms of reservation, the grantors are to convey the water, not from the *flume*, but from the *dam;* and it is insisted, that this language is to receive a strict and literal construction. Were we to yield to this argument, we should, as we think, and for the reasons which have already been given, do manifest violence to the intention of the parties. The argument assumes the fact, that the flume constitutes no portion of the dam : a position which may well be questioned. It is certainly used to *confine*, as well as to draw off the water ; and it might as well be contended, that a waste-gate, used for drawing off the water occasionally, constitutes no part of the dam. But upon the construction contended for, other parts of this reservation are entirely senseless. The grantors are to *retain* the privilege of taking water from the *dam*—a privilege, on the principle assumed, never yet enjoyed by them. The truth is, the words " pond," " dam," and " flume," seem to be used, by these parties, as equivalent. And when we take into consideration the entire language of the reservation, in connection with the situation of the parties, and the former use of the water, we can entertain no doubt in regard to their intention. And this view of the case is strongly fortified, by the practical construction which the parties themselves have given to the grant. It is found, that never, until some time in the year 1835, was the right of the plaintiffs and those under whom they claim, to take water through the flume, denied ; and that never, until that time, did the defendants claim the right to use the water in the flume, as they pleased : that, frequently, when the water was low, and was wanted for the use of the lower mill, *Woodruff* requested *Allison*, who had charge of the upper mill, to shut the gates and let the water pass through the conductor to the lower mill ; with which request he always complied.

Upon these grounds, we are of opinion that this objection cannot prevail.

2. Had *Brainard* and *Woodruff* an assignable interest in this use of the water ? It has been contended, that the clause

in their deed, upon which we have already commented, is a reservation, and not an exception: and several authorities have been cited to show, that a reservation in a deed, is to be most strictly construed.    We do not deem it very material to enquire, whether the clause in question is a reservation, or an exception; for we are decidedly of opinion, that, upon every principle of interpretation, *Brainard* and *Woodruff* had an assignable interest in this use of the water.   That they had such an interest in a moiety of it, *to be used in some manner*, is unquestionable; for, as we have seen, they were owners of the whole; of a moiety of which they had never parted with.    The question, then, is reduced to this; whether they had an assignable interest *in this particular use* of the water?   The objection is, that the use is reserved to them, without naming their heirs and assigns.   Now, if we are right in the ground already taken, that their right to this use of the water was perfect, independently of the reservation in their deed, and that such right is not impaired by the reservation, there is an end of the question.   But let us, for a moment, examine the language of the reservation, and see what are the rights of the grantors, under that.   It is true, that the right is reserved to them, without words of inheritance, and without naming their assigns.    But it becomes material to enquire for what purpose the reservation was made.   It was "*for the necessary accommodation and use of the old shop.*"   Of this they were the owners in fee simple; and can it be supposed, that they meant to limit the use of the water, without which the establishment was of no value, to their own personal occupancy?   And can it be believed, that such was the intention of the parties to this deed?   The idea is opposed to every presumption, and to all probability.   Are we, then, prevented, by any rigid rule of construction, from giving effect to the intention of the parties? We know of none; and we think this part of the case entirely free from doubt.

3. We enquire whether the plaintiffs are entitled to the relief sought by the bill?   The only objection interposed, in this part of the case, is, that the plaintiffs and *Hezekiah Scovil*, one of the defendants, are tenants in common of the mill, as well as the water privilege.

It has hardly been contended, *that in no case*, will a writ of injunction lie, in favour of a tenant in common, against his

*Middlesex,*
July, 1837.

Kennedy
*v.*
Scovil.

co-tenant. Such a position cannot be sustained. It is opposed, not only to the well established principles of chancery proceedings, but to the authority of decided cases. A bill for an injunction is always addressed to the discretion of the court. Yet the exercise of that discretion is to be governed by some settled and known rules. The general principle is, that a writ of injunction lies to prevent a person from doing an act which appears to be against equity or conscience. 1 *Mad. Ch.* 104. And the writ may be obtained, by one tenant in common against another, to prevent a destruction of the joint property, and also to restrain malicious waste. *Hale* v. *Thomas,* 7 *Ves.* 589. 1 *Mad. Ch.* 122. 2 *Swift's Dig.* 136. *Hawley* v. *Clowes,* 2 *Johns. Ch. Rep.* 122.

The only remaining enquiry is, whether the case before us falls within the general principle. And to show that it does, it can only be necessary to advert, very briefly, to the facts found by the court.

It is found, that the defendants, by means of a new orifice, made lower down in the flume, have almost entirely diverted the water from the plaintiffs' works; and that they have denied, and do deny, the right of the plaintiffs to take any water for the use of the lower mill, by means of a conductor placed in the flume. It is further found, that, by means of these acts of the defendants, the plaintiffs are unable to operate their works more than about three hours in a day; and during a great portion of the time, not at all. Now, that these acts tend not only to injure, but to destroy the property, cannot admit of a doubt. A mill can be of no value, when the water, by which it is operated, is wholly diverted : and we all know, that a manufactory that cannot be operated more than three hours in a day, and that at intervals, cannot be operated to any purpose. It is of no possible value.

But it has been urged, that the remedy of the plaintiffs is by writ of partition. And suppose they have that remedy, and that the writ were now pending ; this would furnish no reason, according to the case cited from 2 *Johns. Ch. Rep.,* why the present application should not be sustained : why the waste should not, in the meantime, be stayed. But how can this property be aparted? Can the privilege of the water, the whole of which is necessary for carrying on the works, be divided? And how is this manufacturing establishment and its

Kennedy
*v.*
Scovil.

implements, to be set out in severalty ?   Will you give the trip-
hammer to one ; to another, the anvil ; and to a third, the bel-
lows ?   The property is, in its nature, indivisible; and it is
a mockery in these defendants, after having ruined the estab-
lishment, to talk of partition.   Upon the whole, we are of
opinion, that the plaintiffs are entitled to the relief sought by
their bill ; and would accordingly advise the superior court to
pass a decree, that the defendants be enjoined against prevent-
ing the plaintiffs from taking one half the water from the
flume, for the use and accommodation of the mill below, by
means of the conductor mentioned in the bill, or one similar
thereto, which may hereafter be constructed.

In this opinion the other Judges concurred.

Decree for plaintiffs.