THE FORREST MILLING COMPANY, HARRIS & COLE BROTHERS, NORMAN H. HARRIS, RUTHEDGE HARRIS, J. J. COLE, J. W. COLE, and W. R. COLE, Appellees, v. THE CEDAR FALLS MILL COMPANY, THE CEDAR FALLS PAPER MANUFACTURING COMPANY, and G. N. MINER, Appellants, and H. H. CLAY, H. OLBRICH, W. R. GRAHAM, J. T. KNAPP, Trustee, C. C. KNAPP, J. T. KNAPP, and MARY G. OVERMAN, JESSIE F. COLLINS AND LIZZIE ROGERS, Heirs of D. C. OVERMAN, Deceased, Appellees.

**Water Power:** HEAD: *Deeds.* A conveyance of a mill lot and the right to one hundred inches of water, which describes the lot by metes and bounds, does not, by fixing its river boundary at low water mark, limit the "head" of water, so as to prevent the grantee increasing it by excavating the tail race below the then low water mark.

SAME. Each of the parties to whom the owner of a water power conveys parts thereof, describing it in each case as so many inches of water, without any limitation as to the "head," but with conditions making the grantees liable for their proportionate share of the expense necessary to repair or improve the race, dam and other structures creating the water power, is entitled to as nearly the same head as the conditions will permit of.

*Same.* The various owners of water rights in connection with a mill dam and race have the right to the same head of water, or as nearly the same as the topography of the ground, the fall of the main race, and other conditions admit of, in the absence of contrary provisions in the deeds conveying such rights, where they have been accustomed to excavate about the tail races leading from their mills, as they see fit, without any objection from other owners.

SAME. The rule that the grant of a mill or of a privilege of a mill carries with it not only the land on which it stands, but the land

and water actually and commonly used therewith and necessary to its enjoyment, does not apply to a conveyance of a specifically described lot, though there be a mill upon it.

SAME: *Tenants in common.* Where four persons own a water power in common, the land on which it was developed, and adjoining land divided into lots, and three of the persons, at their own expense, erect a mill on one of the lots, and conduct water thereto from the head race, and the fourth likewise constructs a mill on another lot, and conducts water thereto, the deed of the latter to the former of an undivided one-fourth of several lots, including that on which was their mill, or the deed of the former to the latter of an undivided three-fourths of other lots, including that on which was his mill, conveys none of the water rights of the grantors, either as an easement or otherwise.

NOTICE: *Partition.* The use of water rights, as appurtenant to land, by grantees of the land in possession thereof, does not of itself operate as notice that there has been a parol partition of the water rights which had previously been held in common by the grantors in such deeds and other persons, where such use is referable, as well, to their rights as tenants in common.

*Same.* The record of a deed to land on which a mill operated by water is located does not charge a subsequent purchaser of water rights in the race from which the water for the mill is obtained, with notice of any interest of the grantee, in such water rights.

WATERS: *Deeds.* A conveyance by one of four tenants in common of land, to the other co-tenants, of an undivided fourth interest in a certain part of the land which is used for milling purposes, does not carry with it, as a necessary incident to the beneficial enjoyment of the land conveyed, a similar interest in water rights owned by the same persons in common, as the grantees would have the right to use the water because of their interest therein as co-tenants.

*Co-tenancy.* A conveyance of an undivided fourth interest in a lot and mill, together with all the rights and privileges appurtenant thereto, does not convey any interest in the water power used for such mill, owned in common by the grantors in such deed and another person, which will be valid as against subsequent grantees of such water power under deed by all the persons owning an interest therein.

*Same.* A tenant in common of lands on which his co-tenants have built a mill with their own means, and at their own expense have turned the water on their wheels from a mill race owned in common by the same parties, does not, by conveying his undivided interest in such land to his co-tenants, so enhance the value of the land sold, by any artificial arrangement of his property, as to cause the right to use the water to pass by the deed.

*Same.* A conveyance by part only of the tenants in common of a water power, of an aliquot part thereof, is invalid as against subsequent purchasers from all the co-tenants.

*Same.* Less than all the tenants in common cannot create an easement in the common property and convey it to another.

Estoppel. One whose remote grantors of a lot conveyed therewith only part of the water which had been made appurtenant thereto, and conveyed the remainder to another, is, like · such grantor, estopped to assert invalidity of the latter conveyance, on the ground that water which has been made appurtenant to land cannot be severed and sold separate from it.

*Same.* Where all the parties owning a water power formed a voluntary association for the purpose of repairing and keeping up the power, the payment by certain members of assessments levied against them, based on their ownership of certain water, will estop other members to assert the invalidity of the conveyances of water to them.

*Appeal from Black Hawk District Court.*—Hon. C. F. Couch, Judge.

## Friday, October 29, 1897.

This is a contest over the rights and interests of the respective parties in and to a water power located upon and along the Cedar river, at the city of Cedar Falls. From a decree fixing and declaring the rights of the several parties and enjoining the defendants from making certain excavations in the main race, and declaring that plaintiffs had the right to excavate and deepen the tail races from their mills, so that they might have a "head" equal to the greatest on the aforesaid water power, the defendants, the Cedar Falls Mill Company, the Cedar Falls Paper Manufacturing Company, and G. N. Miner appeal.—*Affirmed.*

*Mullen & Pickett* for appellant Cedar Falls Mill Co.

*J. J. Tolerton* for appellant Cedar Falls Paper Manufacturing Co.

*Hemenway & Grundy* and *J. D. Nichols* for appellant G. N. Miner.

*Boies, Husted & Boies* for appellees W. R. Graham and others.

DEEMER, J.—The facts are complicated, and the issues so involved that we find it very difficult to make a clear and comprehensive statement of the case. It appears that prior to the year 1848 one Sturgis was the owner of the land now known as the "Old Mill Square," at the city of Cedar Falls. This tract comprises about thirty-eight acres of land, and included the water power which is now the subject of controversy. In April of that year, he conveyed an undivided three-fourths of this land to J. M. Overman, D. C. Overman, and Edwin Brown; and on the same day, but by a different instrument, he conveyed the remaining one-fourth to James Newell, who, in turn, in July of the same year, conveyed the said one-fourth to William F. Overman. Before selling the land, Sturgis had commenced building a dam across the Cedar river. This dam was completed by Brown and the Overmans, and they also constructed a head race from a point some distance above the dam, along and across the land owned by them, for the purpose of conveying water to the mills thereafter to be erected. In 1854 William F. Overman conveyed his interest in the land and water power to Henry H. Meredith; and from that time, until the execution of the conveyances hereinafter referred to, the two Overmans, Brown, and Meredith owned the entire tract of land and water power thereto appurtenant, as tenants in common. In 1856, and after the head race had been constructed as far as the tract known as "Lot 21," the Overmans and Meredith, at their individual expense, erected a flouring mill upon said lot

21, and put in four water wheels, of an aggregate capacity of one thousand, two hundred inches of water, to furnish power, and used and appropriated that amount of water from the main race. In 1857 and 1858, Brown, at his expense, erected a mill upon what is now known as "Lot 24." This mill was also connected with the head race, and was supplied with four wheels, using an aggregate of one thousand, two hundred inches of water.

The parties to this controversy claim title by various mesne conveyances from these original owners. The Forrest Milling Company claims title and a right to draw three hundred inches of water from the race, under the following grants: In 1864 the Overmans, Meredith, and Brown executed and delivered to Charles Elliott and Micajah Collins a deed, by metes and bounds, to what is known as "Lot 28," in Mill Square addition, together with three hundred inches of water to be used in driving machinery upon the premises. This interest the Forest Milling Company acquired through certain mesne conveyances. The plaintiffs the Forrest Milling Company and Harris & Cole Bros. also claim title to what is now known as "Lot 32," in Mill Square addition, together with the right to draw one thousand inches of water from the mill race, through certain mesne conveyances from the Cedar Falls Starch Company, that obtained title through a conveyance to it by the Overmans, Meredith, and Brown on August 31, 1866. The defendant J. F. Knapp claims the right to one hundred inches of water from the main race, to be taken opposite lot 24, as successor in interest to Sophronia M. Wilcox and Henry Budge, who obtained their title as follows: In 1865 the co-tenants above described executed to said Wilcox and Budge a deed to a right to use one hundred inches of water from the mill race, and Wilcox and Budge sold their interest and

right to this defendant. Clay & Olbrich, defendants, and G. N. Miner, claim an interest in said water power as successors in interest to Henry C. Overman, who acquired it as follows: In June, 1866, D. C. Overman executed and delivered to H. C. Overman a deed for lot 20 in Mill Square addition, and on the same day the co-tenants above mentioned sold to H. C. Overman the right to draw two hundred inches of water from the mill race on the east bank, and directly in front of lot 20. These deeds were not recorded, however, until November 9, 1866. H. C. Overman conveyed the right to one hundred inches of this water to G. N. Miner, and the other one hundred he conveyed to Clay & Olbrich. Miner also claims that he is the owner of and entitled to draw from the race one thousand, four hundred inches of water, as appurtenant to lot 21 of Mill Square addition, under the following conveyances: (1) A deed in July of the year 1858, from Brown to the Overmans and Meredith, covering an undivided one-fourth interest in and to lots 2, 3, 4, 5, 7, 8, 9, 11, 21, 22, and 23 in Mill Square addition. The Overmans and Meredith, at the same time, and evidently as a part of the same transaction, deeded to Brown an undivided three-fourths interest in lots 1, 6, 10, 14, 15, and 24, in the same addition. A second deed, in April of the year 1861, from the Overmans and Meredith, conveyed an undivided one-fourth of the premises known as "Lot 21," with all rights, privileges, and appurtenances thereto belonging, to Elizabeth Wright; she, in turn, conveying the same to Miner. He also claims a right to the other three-fourths interest as successor to the rights of the Overmans and Meredith under a foreclosure sale of their interest under a mortgage executed after the conveyance to appellees' grantors. Miner also claims that he is entitled to three hundred inches of water as the partial successor in interest to the rights

of J. M. Overman, D. C. Overman, and Ellen C. Meredith, under the following conveyances:  In April of the year 1863, the Overmans and Meredith conveyed the undivided one-half of lot 26, with the right to one thousand, six hundred inches of water from the race, to Shepard Wilson.  But one thousand inches of this water was used by the mill on lot 26, and Wilson and another (one Van Saun, who had become interested with him), and who together owned all of said lot, conveyed six hundred inches of this water to L. N. and D. H. Fabrick, as an appurtenance to lot 27.  D. H. Fabrick conveyed his interest in lot 27 to L. N. Fabrick, and L. N. Fabrick conveyed three hundred inches of the water, without any land, to Alexander Graham.  L. N. Fabrick then conveyed lot 27 to Rhodes & Dayton, through whom the Cedar Falls Mill Company holds title.  Thereafter, and in 1879, Fabrick executed a deed to Miner, purporting to convey to him the right to draw three hundred inches of water from the mill race.  The Cedar Falls Paper Manufacturing Company claims title to and the right to draw one thousand two hundred inches of water from the race, through foreclosure of a mortgage executed by Edwin Brown, who obtained title, as is claimed, under the deed from his co-tenants, of date July 18, 1858.  The mortgage so foreclosed was executed on the sixth day of October, 1866, after appellees' grantors had obtained title.  The Cedar Falls Mill Company claims title to one thousand, six hundred inches of the water as successor to the interest of Shepard Wilson, who obtained his title through a deed of conveyance from the Overmans and Meredith, dated April 18, 1863, covering the undivided one-half of lot 26 in Mill Square addition, and the right to use the undivided one-half of one thousand six hundred inches of water.  In October, 1867, Brown conveyed to the Overmans and Meredith his one-fourth interest in and to lots 26 and 27, and a

right to draw one thousand, six hundred inches of water, as appurtenant to lot 26; and thereafter the Overmans and Meredith conveyed the remaining half of lot 26, with the water rights appurtenant to lot 26, to Wilson, who thereafter conveyed the same, as we have stated, to the Cedar Falls Mill Company. The Cedar Falls Mill Company also claims title and the right to three hundred inches of water, obtained by the conveyance from Rhodes & Dayton, heretofore referred to.

In April of the year 1853, and before Meredith acquired any interest in the lands, the Overmans and Brown made and caused to be recorded a plat of the town of Cedar Falls, which plat included in its boundaries a portion of the lands in controversy, and caused to be surveyed and set apart as a water site the tract of land comprising thirty-eight acres heretofore referred to. The Cedar river flows in a southeasterly direction through this tract, and furnishes the power which is the subject of controversy. In 1858 the Overmans, Meredith, and Brown caused to be surveyed and platted into lots (numbering from 1 to 24, inclusive) certain lands adjoining the town of Cedar Falls and the thirty-eight acre tract hitherto mentioned, and caused the same to be denominated "Mill Square Addition" to the town of Cedar Falls. None of the original thirty-eight acres were divided into lots, nor were they included within the boundaries of this addition. In October of the year 1867, Brown executed and delivered to the Overmans and Meredith a deed to an undivided one-fourth of the right to draw water from the main race to be used upon lot 21 in the Mill Square addition, and his undivided one-fourth interest in and to lots 26 and 27, with the right to draw from the mill race one thousand, six hundred inches of water. And, on the same day, the Overmans and Meredith executed and delivered to Brown a deed conveying to him an

undivided three-fourths interest in the right to draw one thousand, two hundred inches of water to be used upon lot 24 in Mill Square addition. These deeds were a part and parcel of the same transaction, and the only consideration therefor was the mutual conveyances and promises between parties. They all contained this condition: "Subject, however, to the payment of such part of the expenses for necessary repairs and improvements to the race, dam, and other structures creating the water power in Cedar Falls, aforesaid, as the amount of water herein conveyed bears to the amount of water used on said race, or as may be hereafter used at the time such expenses are incurred; and subject to the further right of the parties owning water rights to draw off the water from said race for necessary repairs and for improvements to said water power. And provided, further, that if, at any time hereafter, there shall not be sufficient water in said race to propel all the machinery driven by the same, that then the grantees herein shall only draw their just proportion of the same." Since the commencement of this action, the Forrest Milling Company has acquired the undivided one-half of the residue of the property known as the "Old Mill Square," and the defendant G. N. Miner is the owner of the other undivided half. In the year 1875 an association composed of the various owners of the water power was formed, under the name of the Cedar Falls Water Power Company, for the purpose of maintaining the dam and the race, and of assessing the expenses thereof against the various owners of the power. These assessments, made from time to time, were paid by the various owners, as follows: The Cedar Falls Mill Company paid upon one thousand inches of water; the Cedar Falls Paper Manufacturing Company paid upon one thousand inches; Miner paid, during a part of the time at least, upon two

thousand inches; Harris & Cole Bros. paid upon five hundred inches; and the Forrest Milling Company upon five hundred inches. Harris & Cole Bros. and the Forrest Milling Company refused to pay one of these assessments, and withdrew from the association. Thereafter the other members of the association proceeded to improve the race, by making excavations below the mills of these parties who withdrew from the association. To this, plaintiffs objected, and commenced this suit to prevent work on the race below their mills.

The defendants insist upon their rights to improve the property in the manner contemplated, averring that such work was for the mutual benefit of all the owners.

In answers and cross-petitions, defendants assert their respective rights to the water power, and further say that plaintiffs were excavating the head race in such manner as to impede the flow of water, and also charge that plaintiffs have extended their tail race below low water mark, thus giving them a greater head than that to which they are entitled under their deeds. Each of the parties plaintiff and defendant claim a prior and superior right to that of all others, in the water power. The supply of water is frequently insufficient to operate all the mills upon the race, or to furnish to the owners the number of inches called for in their deeds. As this suit was originally brought to restrain defendants from excavating in the race below plaintiffs' head gates, and as the defendants in their cross-petition ask an injunction to restrain the plaintiffs from excavating their tail race below low water mark, and from using more than one thousand inches of water from the main race, we will consider the rights of the parties in these respects before determining their respective rights and priorities under the various conveyances to which we have referred.

The trial court found that each of the several parties was entitled to draw the amounts of water

which should be allotted, from the same common head, and that, to obtain it, any or all of the parties might excavate and extend their tail race into the bed of the river and the thirty-eight acres of land aforesaid, so far as might be necessary for the purpose. It also found that the proper method of improving the main race is to place the bottom thereof substantially upon a level, and the provisional injunction theretofore granted was so modified as to permit the improvement of the race below the head gates of the plaintiff's mill by the removal of substances therein, commencing at the highest points and projections, and continuing such removals with a view to placing the bottom of said race as nearly upon a level as possible. The lower court found, as we think correctly, that the conveyance from the tenants in common of the Old Mill Square, and the water power connected therewith, to the starch company, of lot 32, and the right to draw at all times one thousand inches therefrom, which right is now owned by the plaintiffs, described the lot by metes and bounds, and fixed the river boundary at low water mark; that, at the time the property was improved, the tail race was excavated about one foot below low water mark as it then existed, and, since the acquisition of the property by the plaintiffs, the said tail race has been excavated and extended considerably further below low water mark; that none of the deeds or other written instruments fixed the amount of head to which any of the owners are entitled; and that the present head at plaintiff's mill is seven and one-half feet, at the Cedar Falls Mill Company's mill eight and one-half feet, at Miner's mill ten and one-half feet, and at the Paper Manufacturing Company's mill something in excess of any of these figures; that, since the dam was constructed, it has been raised about one foot, at the common expense of the owners of the power; that the highest point in the main race is above the plaintiffs' head

gates, and that below such head gates the surface of the bottom of the race is irregular and uneven, detracting from the value of the power furnished by said race, by reason of the water having to pass over such obstructions, and the accumulation of ice in the winter season, and the action thereof; that the better and more effective power is produced by making the bottom of the race as nearly level as possible, and with but a slight incline therein.

From these facts it clearly appears, we think, that the court was right in its decree directing how the main race should be improved. As to the excavations made by plaintiffs in their tail race, it is sufficient to say that there is nothing in any of the conveyances limiting the "head" to which they are entitled, unless it be in the description of lot 32, which fixes the river boundary of the lot at low water mark. We do not think this has anything to do with the head to which they are entitled. By going upon the land not covered by their deeds, they may be committing a trespass, but defendants do not complain of this. They say that plaintiffs have no right to excavate the tail races from their mills, so that the head of water used by them may be increased, and that they are limited by the deed to which we have called attention. Until this litigation arose, the various owners excavated about the tail races leading from their mills as they saw fit, and without any objection from any of the others; and, in the absence of limitation not found in these deeds, we think each of the parties had the right to the same head of water, or to as nearly the same as the topography of the ground, the fall of the main race, and other conditions would permit of. This position is strengthened by the fact that nearly all the deeds to which we have referred contain conditions making the grantees liable for their proportionate

share of the expense necessary to repair or improve the race, dam, and other structures. Of course, no one can so excavate as to deprive others of their just proportion of the power. The excavation proposed will not have this effect, and we are satisfied that the decree is correct in these respects. Mention has already been made of a fact to which attention should be given in connection with the matters now under consideration,—that the Forrest Milling Company and defendant Miner are the owners of what remains of the water power and original Mill Square not covered by the conveyances to which we have referred.

The most serious contention in the case, and the one involving the most doubt, relates to the rights and interests of the various parties in and to the water power in question. The conveyances under which defendants and appellants claim are all prior in point of time to those under which the plaintiffs claim, and defendants are entitled to priority, provided these deeds conveyed a right to any part of the water, and were executed by the necessary parties. The conveyance which is at the foundation of Miner's claim is the deed from Brown to the Overmans and Meredith, of date July 19, 1858. It conveyed, among other things, "the undivided one-fourth of lot 21, Mill Square, town of Cedar Falls." Nothing is said about water rights. At that time, however, the main race had been extended from the southerly boundary of Mill Square, and the four joint owners of the same had, at their own expense, conveyed the water from the main race to the mill erected by the Overmans and Mered.th upon lot 21, which adjoined the thirty-eight-acre tract on the south. At the time this deed, as well as the others bearing the same date to which we have referred, were made, a large part of the land owned by these co-tenants was undivided; and, unless this deed from Brown to his co-tenants operated as a partition of the water power or a

transfer of a part thereof to the grantees therein named, then there was no valid sale or conveyance of water rights until the deeds of October 19, 1867, which were subsequent to the dates of the original conveyances under which the plaintiffs claim. The deed itself does not purport to convey any water rights. It is said, however, that they passed, to the extent the water was then in use, by implication, as an easement in or appurtenance to the land. To this question we will first give our attention.

The mill erected on this lot was built by the Overmans and Meredith at their own expense, just as the mill upon lot 24 was built by Brown from his own funds. The water, it is true, had been carried from the main race, which was upon the thirty-eight-acre tract, to these lots, and was being used by the builders of these mills, as we have stated. In equity, the mill belonged to the tenants who erected it; for it is an elementary rule that, when one co-tenant erects permanent improvements upon the common property, he is, as between himself and the co-tenants, the separate and individual owner thereof, and they will be allotted to him upon partition. Freeman, Co-Tenancy, sections 262, 505. This rule was also enforced in this case by agreement of the parties, in virtue of which they improved separate and distinct tracts of land. As no water rights were expressly conferred, they did not pass unless by implication. In some cases it has been held that a grant of a mill or of a privilege of a mill carries with it not only the land upon which it stands, but the land and water actually and commonly used therewith, and necessary to its enjoyment, on the theory that such a general description carries with it all things which have been used with the principal thing, and which in fact constitutes or is reputed to be a parcel of it. Gould, Waters, section 307; *Taylor*

*v. Bradley*, 18 N. Y. 109; *Ogden v. Jennings*, 62 N. Y. 526. This rule does not apply to the case at bar, for the reason that the description is specific in its terms, and refers to a lot which had certain well defined boundaries; and the water right did not pass as a part of the thing granted, unless as a necessary incident to the beneficial enjoyment of the thing granted. *Parsons v. Johnson*, 68 N. Y. 62. Easements of necessity sometimes pass by implication where no mention of them is made in the conveyance. The foundation of such a right is a necessity, and not convenience. Gould, Waters, section 362; *Ward v. Robertson*, 77 Iowa, 161. It has already been noted that the original conveyances of the land were between tenants in common, not only of the premises, but of the water power as well, and there was no reason for implying the grant of an easement in the water power. When Brown conveyed to the Overmans and Meredith, they then owned three-fourths of the water power in controversy, and had in their own right plenty of water with which to run the mill. Nothing passed by implication from necessity. *Ogden v. Jennings*, 62 N. Y. 526; *Ward v. Robertson, supra.*

Appellants claim that the power passed as an appurtenant to the mill. It is no doubt true that, as a general rule, an existing easement appurtenant to an estate will pass by a grant in general terms. But an easement which is extinct or which has no legal existence, though used *de facto*, does not pass as an appurtenance. 3 Hillard, Real Property, p. 514, section 40. It is also elementary that no one can create an easement against himself in his own land. For this reason, it has been held that a tenant in common who owns other property in severalty cannot so use the last as to acquire for the benefit of his individual estate an easement in the property held in common. *Crippen v. Morss*, 49 N. Y. 63; *Great Falls Co. v. Worster*, 15 N. H.

412. The land conveyed by Brown to his co-tenants, in favor of which the claimed easement would exist, was owned by the Overmans, Meredith, and Brown in fee, prior to the conveyance; and the land upon which the water power was developed was owned by the same parties. No easement existed at the time of the conveyance, for at that time there was unity of title and ownership in both the so-called dominant and servient estates. Washburn, Easements, pp. 684, 685. It has sometimes been held that when an owner of the whole tenement has, by some artificial arrangement of the material parts of his estate, added to the advantage and enhanced the value of one portion of it, he cannot, after selling that portion with the advantage openly and visibly attached, voluntarily break the arrangement, and thus destroy or materially diminish the value of the portion sold. *Simmons v. Cloonan*, 47 N. Y. 240; *Lampman v. Milks*, 21 N. Y. 505; *Insurance Co. v. Patterson*, 103 Ind. 582 (2 N. E. Rep. 188); *Kelly v. Dunning*, 43 N. J. Eq. 62 (10 Atl. Rep. 276); *Lammott v. Ewers*, 106 Ind. 310 (6 N. E. Rep. 636). This rule does not apply to the case at bar, for the reason that the Overmans and Meredith built the mill upon lot 21 from their own means, and at their own expense turned the water from the main race upon their wheels, as they had a right to do, for they owned an undivided three-fourths of the water power. Brown, the grantor in the deed under which appellants claim, had nothing to do with this artificial arrangement, except to consent to it; and it certainly should not be held that he, as grantor in the deed, made such an artificial arrangement of his property as that the right to use the water passed by the deed under the rule last above referred to. Again, this doctrine, to some extent at least, is based upon the rule of necessity; and we have already seen that there is no room for implying a grant from necessity. One other thought seems to be conclusive of the

proposition that no right to the water passed by the deed from Brown to the Overmans and Meredith, of date July 19, 1858. The mill itself, which was erected upon lot 21, belonged exclusively to the Overmans and Meredith at the time the conveyance was made. It was built upon common property, but at the separate cost of the grantees in the deed. In the absence of a promise, either express or implied, Brown could not be made liable for any part of the cost of the mill; and, as he was not the owner of any part of the improvement, no interest in it passed by the deed under consideration.

It quite clearly appears that the deeds of date July 19, 1858, between the tenants in common of this property, operated as a voluntary partition of the lands described therein, and of nothing else, and that each retained his joint interest in and to the water power until the making of the conveyances to appellees' grantors, and of the partition deeds of water rights, of date October 19, 1867, heretofore referred to, unless it be found that there was a parol partition of the water rights at an earlier day, as claimed by some of the appellants, to which claim we will hereafter give attention. We have seen that the deed from Brown to the Overmans and Meredith did not convey any water rights, and we have further discovered that, aside from the claim of parol partition, there was no division of any part of the water power, or of any rights therein until the deed of date October 19, 1867. In the meantime, however, the plaintiffs and W. R. Graham's grantors obtained conveyances, from all the tenants in common of the water power, of certain rights and interests therein, which they claim to be prior and superior to any rights of the other parties under these partition deeds. These partition deeds, of date October 19, 1867, granted the right to draw from the mill race a certain specified number of inches of water, "to be a

right and privilege appurtenant to the land described in the deeds." This is the first attempt of the parties to make an express written partition of the water rights, and is entitled to great weight in construing the deeds made in the year 1858, between these same parties. The deed from the Overmans and Meredith to Elizabeth O. Wright, under which appellant Miner claims, was of an undivided one-fourth of lot 21, together with all the rights and privileges appurtenant or in any manner thereto belonging, and the mill and appurtenances thereto belonging. It does not purport to convey more than an undivided one-fourth of the lot and appurtenances thereto. These "appurtenances" now claimed by appellants, to be availing, must have existed at the time of the conveyance, and must have been owned by the grantors in the deed. That they did own the lot and the mill situated thereon must be conceded. But they did not own all of the water power. Brown had an interest in it at that time, and a conveyance by three of the four co-tenants of an aliquot part of the water power was of no validity against subsequent grantees of all the proprietors, unless such interest in the water power had theretofore been made appurtenant to the lot. We have already seen that it was not so partitioned by any deed between these co-tenants. The voice of authority is nearly uniform to the effect that, "while a tenant in common may make a valid sale of any undivided fraction of his undivided interest which he sees fit, he cannot be allowed to sell his interest of any portion thereof in a part of the premises by metes and bounds, because this would interfere with his co-tenants' right of partition." *Farr v. Reilly*, 58 Iowa, 399, and cases cited. Likewise, it has been held "that less than all the tenants in common cannot create an easement in the common property, nor convey such easement to another." *Rush v. Railroad Co.*, 57 Iowa,

201; *Marshall v. Trumbull,* 28 Conn. 183; *Adams v. Iron Co.,* 7 Cush, 361; Freeman, Co-tenancy; section 185; *Pfeiffer v. Regents,* 74 Cal. 156 (15 Pac. Rep. 622). This thought disposes of the claims made by Miner as successor in interest to three of the four tenants in common, and of the Cedar Falls Mill Company, under conveyances by the parties to Shepard Wilson.

Miner's claim to certain interest in the water power superior to that of appellees, as a partial successor to the interest of Henry C. Overman, under deed of date June 26, 1866, is not sustained, for the reason that this deed was not delivered or recorded until after appellees' grantors obtained title. The claim of the Cedar Falls Paper Manufacturing Company rests upon a conveyance made in the year 1858, by the Overmans and Meredith, to Brown, of an undivided three-fourths of lot 24; and the same rules of law are applicable to it as to the claim made by Miner of rights under the conveyance by Brown to the Overmans and Meredith, and need not be further noticed. And the same may be said with reference to the claim of this defendant to one thousand inches of water as appurtenant to lot 32.

Plaintiffs claim title to five hundred inches of water, known as the "Graham water." Three hundred of this they acquired by certain mesne conveyances from L. N. Fabrick (he being the then owner of lot 27, with six hundred inches of water), which he acquired from Shepard Wilson and one Van Saun. The Cedar Falls Mill Company claims title to this water under a subsequent deed from the same L. N. Fabrick. The other two hundred inches plaintiffs obtained through certain mesne conveyances from Alexander Graham, who obtained his title from G. N. Miner, to lot 24, with one thousand two hundred inches of water appurtenant thereto, one thousand of which

he conveyed to one Neff, and the remaining two hundred he conveyed to William Graham, plaintiffs' grantor. The Cedar Falls Paper Manufacturing Company claims title to this two hundred inches under a conveyance from Neff of lot 24. These five hundred inches of water were attempted to be separated from the estates to which they were appurtenant, and conveyed by deeds covering nothing but water rights. Appellants contend that such a conveyance is not valid in this state, because water which has been made appurtenant to land cannot be severed and sold separate from the land. We need not decide this difficult and interesting question, for the reason that we find appellants are estopped from denying the validity of these conveyances, which were prior in point of time, to those under which they claim. Defendants' remote grantors, who made the original severance of the water, would be estopped from denying the validity of their conveyances; and, as defendants stand in their shoes, they cannot be heard to say that the conveyances are invalid. *Weare v. Williams*, 85 Iowa, 253, and authorities cited.

Moreover, it appears that all the parties formed a voluntary association for the purpose of repairing and keeping up the power, and plaintiffs paid assessments levied against them by this association, of which defendants were members, based upon their ownership of the water in dispute. Such fact operates as an estoppel upon the defendants, and they cannot now be heard to say that the conveyances were invalid.

We have now disposed of every claim in the case save that of parol partition, which the defendants and appellants, or some of them, say was made in the year 1858. The exact claim is that the original owners, by their acts and agreements, made a parol partition of a part of the real estate, water and water rights owned by them in common. That

they did make a voluntary partition of a part of the
real estate must be conceded. But the more important,
and indeed the only, question in this connection, is, did
they partition the water or water rights owned by
them at or about the time the conveyances were made
in the year 1858? There are authorities which hold that
parol partition may be made of property owned in
common, and that, when such partition is followed by
actual possession in severalty, each tenant will there-
after hold the part assigned to him in the severalty, in
fee.  *Wood v. Fleet,* 36 N. Y. 506; Freeman, Co-tenancy,
section 393. Where this rule prevails, it no doubt
applies to a water power and to water rights. *Cooper
v. Water Power Co.,* 42 Iowa, 398; *Kennedy v. Scovil,*
12 Conn. 317; *Hanson v. Willard,* 12 Me. 142; *Brown
v. Cooper,* 98 Iowa, 444. If it be conceded that such
rule obtains in this state,—a point not now decided,—
it follows that the question is one of fact, and the bur-
den is upon the defendants who tender such issue to
prove it. Two of the original co-tenants were witnesses
upon the trial, and each of them denied any partition of
the water power or water rights until the execution of
the deeds, in the year 1867. There are some facts point-
ing to such a voluntary division of the water, but in the
face of the denials of these witnesses we are not justi-
fied in finding that such an arrangement was entered
into. The written documents which have been offered
in evidence belie the claim made, and give support to
the plaintiffs' contention that no partition was made
until the year 1867, after they had acquired their rights
by conveyances from all the tenants in common. The
possession and use made of the water by the co-tenants
was no more referable to ownership in severalty
than to the right of each to have the use of
the common property belonging to all the parties. But,
aside from this, we are constrained to believe that

plaintiffs are innocent purchasers of the property, without notice of any such parol partition as is claimed. When they became the owners of the land and water rights, the conveyances which we have noticed were all of record. From these conveyances they were justified in believing that the conveyances to the starch manufacturing company, Wilcox & Budge, and to Elliott & Collins were the first which attempted to grant any water rights. True, there were conveyances antedating these referring to water rights, but none of them were made by all the owners of the property. The only partition of record was that made in the year 1867, after plaintiffs' grantors obtained the title under which appellees now claim. The deeds of 1858 did not on their face purport to convey any water rights or privileges. True, Brown or his grantees, and the Overmans and Meredith and their grantees, were in the use of the water power and the rights; but there was nothing of record to indicate that either the mills or even the water power were in existence in the year 1858. The first reference of record to the mills is in the deed to Elizabeth Wright, of date April 1, 1861; but this, as we have seen, was made by but three of the four tenants in common, and was invalid as against subsequent purchasers from all of the co-tenants. Aside from this, had they known that Brown and the Overmans and Meredith were making use of the water to propel the machinery of their respective mills, still they might well infer that it was in virtue of their rights as tenants in common, and the deeds of partition made in the year 1867 would be confirmatory evidence of this fact.

When plaintiffs purchased their property, they acquired what appeared from the face of the records

to be a superior interest in the water power to that of any of the appellants in this suit. It is true that Elliott & Collins and Budge & Wilcox and their grantees have rights superior to those acquired by the appellees Harris & Cole Bros.; but they were fully protected by the decree rendered by the trial court. Appellees were charged by the record with notice of rights created by the instruments as recorded, and not with notice arising from unrecorded instruments, or from facts surrounding the instruments which were not of record. *Miller v. Ware*, 31 Iowa, 524; *Disque v. Wright*, 49 Iowa, 538. And while it is true that some of appellants were in possession of lands, and were using water rights as appurtenant thereto, at the time the plaintiffs purchased, yet such use did not of itself indicate that there had been a parol partition of the property between the original tenants in common before the conveyances were made to plaintiffs' grantors. *May v. Sturdivant*, 75 Iowa, 116; *Bonnell v. Allerton*, 51 Iowa, 166. Again, the possession by appellant Miner of a part of the water power at the time plaintiffs, or some of them, purchased their interest in the power, might properly be referred to the title originating by the deeds of partition executed in the year 1867. See authorities above cited, and Webb, Record Titles, section 232, where it is said: "Where a person occupies premises, and the record shows a conveyance under which he would be entitled to the possession, in such case his possession will be referred to the record title, and a subsequent purchaser will not be charged by it with notice of any other undisclosed title or equity which the occupant may have. The possession is a matter tending to excite inquiry, but the fact that the occupant has placed upon the public records written evidence of his right, with the terms of which his possession is consistent, arrests inquiry at that point, and

reasonably informs the purchaser that he may rest upon the knowledge thus obtained."

The trial court found that the Forrest Milling Company, as successor to the interests of Elliott & Collins, is entitled to draw three hundred inches of water from the race, provided that, if at any time there is an insufficient supply to propel all the machinery which was on the race in 1864, it shall only draw such proportionate part of the three hundred inches as the whole at such time supplied by the dam and race shall bear to the whole number required to run all the machinery which was on the race at that date; that Knapp, as sucessor to Wilcox & Budge, was entitled to draw one hundred inches, subject to the prior right of the Forrest Milling Company, and subject to diminution when there was failure of supply; that the Forrest Milling Company and Harris & Cole Bros., as successors to the Cedar Falls Starch Company, are entitled to draw one thousand inches, subject to the prior rights of the parties above mentioned; that, subject to these rights, appellants Miner and Clay & Olbrich, as successors in interest of Henry C. Overman, are entitled to draw two hundred inches of water; and that after the parties named have been supplied with the number of inches of water to which they are, respectively, entitled, as aforesaid, the residue is to be divided as follows:   One thousand inches to Cedar Falls Mill Company, one thousand inches to Cedar Falls Paper Manufacturing Company, one thousand seven hundred inches to G. N. Miner, and five hundred inches to Forrest Milling Company and Harris & Cole Bros.; that none of the owners of said residue are entitled to any priority over the others; and that, in case of insufficient supply, then the parties are entitled, after the owners of the prior rights are supplied, to appropriate the residue as follows:   The Cedar Falls Mill Company ten-forty-seconds

thereof, the Cedar Falls Paper Manufacturing Company ten-forty-seconds thereof, G. N. Miner seventeen-forty-seconds thereof, the Forrest Milling Company and Harris & Cole Bros. five-forty-seconds thereof; and, in case of excess in the supply, then the Forrest Milling Company and G. N. Miner are entitled to an equal share of such excess. Our extended examination of the record leads us to the conclusion that this disposition of the case is approximately correct. We have not considered all questions argued, for the reason that to do so would unduly extend an opinion which, at best, is entirely too long. Our effort has been to decide what appear to be the controlling points, and our conclusion is that the decree should be AFFIRMED.