# Richmond

## WARNER MOORE, SURVIVING PARTNER, ETC., OF WARNER MOORE AND COMPANY V. THE CHESAPEAKE AND OHIO RAILWAY COMPANY.

January 12, 1933.

Present, Campbell, C. J., and Holt, Epes, Gregory and Chinn, JJ.

706

The opinion states the case.

*Robert E. Scott* and *McGuire, Riely & Eggleston,* for the appellant.

*D. H. Leake,* for the appellee.

GREGORY, J.,* delivered the opinion of the court.

Warner Moore, surviving member of the firm of Warner Moore and Company, instituted a suit in equity, against The Chesapeake and Ohio Railway Company, for the purpose of requiring it to perform specifically its obligations, under several old water grants, to supply certain water for the operation of the appellant's mill and as incidental thereto, to require it to respond in damages for certain losses occasioned by the forced shut down of the mill on account of an inadequate supply of water. The lower court, by decree, denied relief and dismissed the bill and that decree is here for review. The parties will be referred to as appellant and appellee, respectively.

The bill of complaint was filed in this cause on March 18, 1926. Later a demurrer was interposed, which was overruled, and a special plea of the five-year statute of limitations was filed which, upon motion of the appellant, was stricken out. Cross-error is assigned to the ruling of the court on the demurrer, and in striking out the special plea. An answer was filed, voluminous depositions and exhibits were taken and filed in the cause, and a final decree was entered on September 24, 1930.

This litigation involves an old flour mill, located in Richmond and known as the Gallego Mill, and its operation for a century by water power supplied by a canal which originally was owned by the James River Company, later by the

---

*By reason of circumstances over which the court had no control, it became necessary to reassign the task of preparing this opinion. This accounts for the apparent delay in deciding the case.

James River and Kanawha Company, still later by the Richmond and Alleghany Railroad Company, and at present by the latter's successor, the Chesapeake and Ohio Railway Company.

The principal question in the case is the meaning and interpretation of certain grants of water, made many years ago. The performance of the obligations created by those grants has, by the successive transfers of the canal property, devolved upon the appellee, and by successive transfers of the Gallego Mill property, the appellant is entitled to the water supply under the grants.

Warner Moore and Company have for many years owned and operated the Gallego Mill, which is a flour and meal mill of extensive dimensions and capacity, and having a long history of successful operation. The power for the operation of the mill, as stated, is afforded by water taken from the canal under several grants which were made over the period from 1791 to 1842. The grants were made, on the one part, by the early owners of the canal, who were the predecessors of the Chesapeake and Ohio Railway Company, the appellee, and on the other part by the early mill owners who were the predecessors of the appellant. The mill has been burned three times since it was established on the present site—in 1846, 1865 and 1903—but after each fire it was rebuilt on the same foundation.

The water power conveyed in the grants is expressed in terms of inches, square inches, and cubic inches. The main controversy here centers around the extent of water or power which the grants conferred, expressed in such terms. This has given rise to the introduction on both sides of a great deal of technical and scientific evidence, involving hydraulics and mathematics, as well as evidence of practical millers of wide experience in operating mills of the kind here involved.

The appellant contends, as shown from the bill, that the diminished water supply, which resulted in closing the mill in December, 1923, is chargeable to the wrongful acts of

the appellee which constituted a violation of its obligation under the grants. He asks that the appellee be required to comply with its obligation to supply the required water to operate the mill and for damages for the loss sustained by the forced closing of the mill.

The appellee denies any breach of its obligation under the grants which was responsible for closing the mill and the resultant damages. It avers that it furnishes, and the appellant has at all times, and now, receives all the water to which he is entitled. So, generally speaking, the case presents for consideration (a) the nature and extent of the rights conferred by the grants; (b) whether there has been any violation of those rights by the appellee and (c) if so, what is the measure of relief the appellant is entitled to.

It is only necessary here to consider briefly the bill, the demurrer and the answer. A discussion of the plea of the statute of limitations will be taken up later.

The bill of complaint sets forth the history of the Gallego Mill, its equipment and its continuous operation from the beginning until December, 1923, just before the institution of this suit; the large production of the mill and its extensive business; the various transfers of title from the founder of the mill to the present owners and the execution of the grants involved in this litigation creating the water rights which now belong to the appellant. It also sets forth that the obligation of performing the requirements of the grants now rests upon the appellee.

With the bill copies of the grants referred to are filed, and it is alleged that the meaning and purpose of them was to assure and confirm to the mill owners the right to a quantity of water sufficient to provide power to drive and operate the machinery of the Gallego Mill and that the appellee is bound by this obligation. It is further alleged that a sufficient quantity of water for the purpose just stated was at all times furnished by the canal owners until shortly prior to the institution of this suit; that the water supply of the canal became so reduced that it rendered proper

operation of the mill impossible and it became necessary in December, 1923, on account thereof, to shut it down; and that the water supply of the canal became greatly reduced by reason of a great many obstructions, such as foundations for various viaducts, etc., placed in the canal by the Chesapeake and Ohio Railway Company, and further by reason of the filling up of the mill pond or basin which had been for a great many years used to regulate and secure an even flow of water. As a result of these wrongful acts committed by the railway company it is alleged that it is impossible to operate the mill and that the milling business has been destroyed.

The prayer of the bill is that the rights of the complainant (appellant) under the deeds and grants granting water to the Gallego Mill, as fixed by the long and uninterrupted supply, use, and enjoyment thereof, may be established and enforced; that an injunction be granted requiring the defendant (appellee) to remove the obstructions placed in the canal and basin and to require it to furnish the complainant sufficient water to operate the mill; and that adequate damages be decreed to complainant for the loss and damage suffered on account of the wrongful acts of the defendant above set out and for general relief.

The grants filed as exhibits with the bill and those mentioned therein, under which the appellant claims, are designated in the record as the "Gibson and Churchman Grant," the "Banks Grant," two grants to Chevallie, confirmed by a deed in 1834, and the "Warwick and Barksdale Grant" of 1842. The language of the instruments, in so far as pertinent here, will be given.

The Gibson and Churchman Grant was made in 1791, and, eliminating all unnecessary provisions, grants "three sluices of water to issue out of the canal each sluice to contain thirty-five square inches and the bottom of the water in each sluice to be four feet and one-half foot below the top of the water of the canal at its common level it being the intention of the parties that there shall be granted a

body of water which shall afford a pressure of four feet and one-half foot."

The "Banks Grant" was made by resolutions of the James River Company, in 1800, and the pertinent language is "to Henry Banks of thirty-five cubic inches of water with a pressure of four feet and one-half foot at a yearly rental of six dollars per cubic inch."

The Chevallie grants were confirmed to him by deed, uniting the others referred to in him, he having previously acquired those interests and having operated the Gallego Mill. The mill burned in 1833 and the deed of 1834 allowed him to move the mill from where it originally stood to the present site, and he was also permitted to draw the water he was entitled to from the "basin." A part of the language used in this deed is as follows:

"Whereas, by articles of agreement between the parties hereto, made the 29th day of March, 1833, and admitted to record in the office of the Court of Hustings for the city of Richmond, on the ninth day of April, 1833, after certain recitals therein contained, the said company covenanted that the said Chevallie should be authorized to take and use the several quantities of water to which he was entitled under the various contracts therein specified, to be drawn off at the lower end of the basin of the James River canal, in lieu of the site whereat the same had been previously drawn off, and it is now desired that the water which the said company covenanted to permit the said Chevallie to take and use, should be granted to him by valid conveyance.

"Now therefore, this indenture witnesseth, that the said James River Company, for and in consideration of the premises, and especially in consideration of the yearly rent hereinafter reserved, have given, granted, bargained, sold and confirmed, and by these presents do give, grant, bargain, sell and confirm unto the said Peter J. Chevallie, his heirs, and assigns forever, the several quantities of water specified in the said articles of agreement, amounting in the aggregate to five hundred square inches to be drawn off, taken

and used from the lower end of the basin of the James River canal, opposite the said Chevallie's lot of ground, known in the plan of the said city of Richmond as No. 361, under a pressure of four feet, six inches, or under any other pressure less than the said four feet six inches, provided that no greater volume or quantity of water shall be drawn off, taken or used than would be drawn off, taken and used precisely at the said pressure of four feet six inches. To have and to hold the said five hundred square inches of water to the said Peter J. Chevallie, his heirs and assigns forever, yielding and paying therefor yearly and every year to the said James River Company, their successors and assigns, whosoever they may be, the yearly rent of two thousand four hundred and ten dollars, in several portions as follows: Six hundred and ten dollars on the first day of January, thirteen hundred dollars on the first day of July, and five hundred dollars on the seventh day of July in each and every year; * * *."

The foregoing deed was made in pursuance of an agreement in writing bearing date March 29, 1833, whereby the canal owners had agreed to consolidate the prior grants in Chevallie, he having acquired them. The agreement specified the prior grants and gave Chevallie the right to take the water from the lower end of the basin of the James River canal opposite lot No. 361.

After reciting certain stipulations and conditions as to the use of the water, not now material, the agreement refers to the application of Chevallie "to be allowed to draw off and take the several quantities of water to which he is entitled, by and under the various aforesaid grants, from the lower end of the basin of the James River canal opposite the lot of ground, known as lot No. 361, instead of taking the same from the canal at the site where his mills lately stood, and where the same has heretofore been drawn off"— to all of which the James River Company agreed, "subject to all the conditions and stipulations appertaining to the

grants thereof respectively" except in so far as modified by the agreement.

It then refers to a resolution of the president and directors of the James River Company, of April 6, 1831, acceding to an application theretofore submitted by Chevallie: "That the grants of water made to him to be used under a pressure of four feet six inches, should be so modified as to allow him to use the same quantity of water under any other pressure less than the said four feet six inches. Provided no greater volume or quantity of water shall be discharged from the canal on the wheels of his mill, under any circumstances, than would be discharged if taken precisely at the four and a half feet pressure."

Reference is made to the indenture of November 26, 1791, between John Harvie *et al*, directors of James River Company and Josiah Gibson and Enoch Churchman, whereby the latter were granted "three sluices of water to issue out of the canal each sluice to contain thirty-five square inches, and the bottom of water in each sluice to be four feet and one-half foot below the top of the water of the canal at its common level it being the intention of the parties that there shall be granted a body of water which shall afford a pressure of four feet and one-half foot," which grant, it is set out came to be enjoyed by Peter J. Chevallie.

Reference is also made to certain resolutions of the president and directors of the James River Company, entered into on the 15th and 17th days of March and on the 29th day of April, 1800, whereby one Henry Banks became entitled to "thirty-five cubic inches of water with a pressure of four feet and one-half foot," which said grant, it is set out, was vested in Chevallie.

Recital is made of a resolution of James River Company of July 7, 1830, granting to Chevallie "the further quantity of one hundred square inches of water under a head of four feet and one-half foot;" and "A like resolution of December 22, 1830, granting to Chevallie 'a further quantity of two

hundred and sixty square inches of water under a like head.' "

The last instrument filed with the bill is the deed to Warwick and Barksdale of 1842 which was a foreclosure deed and in which the canal company joined for the purpose of granting further water rights. This deed recites that the canal owners had conveyed, in trust, certain property, together with certain water rights to secure certain debts, and the sale of the property at auction and its purchase by Warwick and Barksdale. The property is described, and a part thereof is "the right to draw from the canal * * * forever five hundred square inches of water to be taken under a head or pressure of four and a half feet. Subject to navigation of the canal * * *."

The canal company joined in the deed and this language, including certain recitals, expresses its obligation:

"And the said James River and Kanawha Company do hereby for themselves and their successors ratify and confirm the said conveyance herein recited and made, and do moreover in consideration of a parole agreement made with the said Warwick by the agent of the said company at the time and on the day of sale, covenant to and with the said Abraham Warwick, and William J. Barksdale, their heirs and assigns, that they, the said Abraham Warwick and William J. Barksdale, and their heirs and assigns may transfer from the Rutherford Mills, herein conveyed, to the Gallego Mills, so much of the five hundred inches of water, herein granted, as may be required with the five hundred inches of water now leased at the Gallego Mills to drive the machinery at the said Gallego Mills, as at present constructed, but to be taken under the same limitations and restrictions, as the water herein granted is to be taken under at the Rutherford Mills. Provided, however, and it is expressly understood that by the above phrase, 'So much of the five hundred inches of water, herein granted, as may be required,' with the five hundred inches of water now leased, as The Gallego Mills to 'drive the machinery of the

said Gallego Mills, as at present constructed,' it is only intended to indicate the quantity of water which may be transferred from the Rutherford Mills to the Gallego Mills under this covenant and not to authorize the James River and Kanawha Company to interfere with any changes which the present or any future proprietors of the Gallego Mills may make, in the machinery thereof, provided the quantity of water used is not thereby increased."

All of the grants were made subject to the navigation of the canal. The rights conveyed under the agreement and deed of 1833-1834 were perpetual on an annual rental basis, while the rights conveyed under the deed of 1842 were in fee, for the consideration of $12,000.

The appellee demurred to the bill, assigning these grounds:

"(1) It is apparent upon the face of the bill and the contracts and agreements exhibited therewith, that the defendant is obligated to furnish complainants a certain specified amount or quantity of water, viz, not exceeding 1,000 square inches of water, under a pressure of four feet, six inches; and complainants do not allege that defendant has not been or is not now furnishing complainants with said amount or quantity of water.

"(2) It is apparent from the face of the bill, and the contracts and agreements exhibited therewith, that defendant is not obligated to furnish complainants with water power sufficient to enable complainants to operate their flour and grist mill, as repeatedly in said bill alleged, but is only obligated to furnish the specified amount or quantity of water hereinbefore set out.

"(3) Even if it be true that complainants, for a long period, have been obtaining from the defendant an amount or quantity of water in excess of the quantity to which they were legally entitled under the contracts and agreements, copies of which are filed with the bill, the complainants have acquired no right, legal or otherwise, to be furnished with

such excess, because of that fact, or because of any other fact in said bill alleged."

At this time the late Honorable Beverly T. Crump was the judge of the law and equity court which overruled the demurrer. From the grounds of demurrer, which have just been stated, it appears that the effect of overruling it was to decide that the bill made a good case for specific performance which would be ultimately decreed if the allegations of the bill were later properly sustained by the proof.

Again, upon the demurrer, if the grants were plain and unambiguous, the trial court should have construed them as written, by sustaining the demurrer and dismissing the bill. By overruling the demurrer the trial court evidently rejected the appellee's claim that the grants were plain and that they were apertural.

The appellee filed an answer specifically denying the allegations of the bill of complaint and especially the interpretation placed upon the grants by the plaintiff (appellant).

It averred that the grants were not grants of power but only of a specific quantity of water which would flow through an aperture in area of the number of square inches named, under a head of four and one-half feet, which is computed to be 83.8 cubic feet per second. It denies that the appellant has not received and is not receiving such a quantity. It specifically denies that under the grants a supply of water sufficient for the operation of the mill is required, and it is stated that the appellant and his predecessors, from time to time and over the appellee's protest, has appropriated water far in excess of his right under the grants, and that such appropriation has created no obligation upon the appellee to supply the appellant with such excess water. It is averred that changes in the machinery at the mill since its acquisition by the present owners have greatly increased the water power requirements of the mill exceeding the quantity of water afforded by the grants. Admission is made of the elimination of the storage basin or pond and

it is also admitted that certain obstructions have been placed in the canal, but it is denied that these have reduced the supply of water.

By the decree under review, the bill was dismissed, because the court was of opinion that it was bound by the decision of this court in the case of *Stearns' Ex'r* v. *Richmond Paper Mfg. Co.*, 86 Va. 1034, 11 S. E. 1057, and was compelled to place the same construction upon the grants here involved, as was placed by this court in that case upon the grants there involved; and further that the court was of opinion that the complainants, under such construction, were receiving the quantity of water to which they were entitled and were not entitled to any relief.

■ The issue presented is clear cut. The appellant contends that he is entitled, under the grants, to a sufficient supply of water to operate the Gallego Mill and that such supply has been received for nearly a century; while the appellee contends that the appellant is only entitled, under the grants, to a definite quantity of water, namely 1,000 square inches, that would flow through or be measured by a standard aperture or orifice which would have an area of 1,000 square inches, under a head of four and one-half feet.

The meaning of the terms "inches," "square inches," and "cubic inches," as used in the grants, is one of the important considerations in the case. The appellant claims that those terms, at the time the grants were made, had no definite meaning; that the language used is not plain and unambiguous and that the grants should be construed in the light of the surrounding facts and circumstances then existing and in the light of the practical construction placed upon them by the parties themselves from the time they were made until 1923 when the mill was closed on account of the reduced supply of water. On the other hand, the appellee claims that the grants "speak for themselves;" that they were plain and definite in meaning; that they "mean what they say;" that they grant certain definite and specific

quantities of water, in all, 1,000 square inches; and that the terms "inches," "square inches," and "cubic inches," as used, had a definite and fixed meaning at the time they were used, meant "square inches," not "inches," or "cubic inches," as specified, and that they were aperture or orifice grants. In final analysis, the foregoing is, briefly, the issue in this case.

The parties have supported their respective contentions by a great mass of evidence, and innumerable exhibits have been filed. Formulae for computing and measuring water supply have been introduced by both parties. They have fortified their respective positions by many of the principles of hydraulics, engineering and mathematics in nearly all of its branches. Tables, technical terms and theories, apertures and orifices, are mentioned and discussed. Many pertinent books, periodicals, magazines, articles and ancient records have been brought in. In fact, nearly every instrument, record or work of any kind which would have any possible bearing or shed any light upon the issue presented has been introduced in the evidence, and this along with the technical testimony of hydraulic engineers, of the highest standing and ability, with national reputations, and the testimony of laymen and practical millwrights all combine to produce an enormous record and provide stupendous labor for the court.

While a great many of the facts brought out and much of the evidence introduced have a proper bearing and shed some light upon the subject under investigation, they are not controlling. A discussion of all of that evidence along with that which we consider controlling would result in an almost endless task. When the evidence is examined and sifted one is impressed with these outstanding facts which are deducible therefrom:

(a) None of the grants expressly call for the measurement of the water through an aperture or orifice, nor do any of them mention the term "aperture" or "orifice." They simply grant inches, square inches, or cubic inches, of

water to be taken and drawn off from the canal under a certain specified head.

(b) The water has never been taken through or measured by any aperture or orifice through all the many years of mill operation; the canal company has at all times known that it was not so measured from the very beginning until now, notwithstanding the fact that it knew of this method of measurement from the time the grants were made, or certainly from 1833.

(c) The mill owners, from the beginning of the operations, until 1923, have received at all times sufficient water to run the mill. Of course, the canal owners have, from time to time, complained that the mill owners were drawing off more water than they were entitled to, but on the other hand the mill owners from time to time complained that they were not getting the quantity of water they were entitled to; and aside from the complaints from both of the parties the fact remains that until 1923 the mill owners, with the full knowledge of the canal owners, always obtained, substantially, the quantity necessary successfully to run the mill.

(d) The Gallego Mill had a record of successful operation during the many years of its existence until December, 1923, during all which time it demanded and received the necessary supply of water to run the mill; but in 1923 it was necessary to close operations, on account of the deficiency of water in the canal at or near the mill, which deficiency was not caused by the mill owners.

(e) The closing of the mill by reason of the water shortage resulted in the destruction of the milling business which was a large and profitable one, producing between 1,000 and 1,500 barrels per day, leaving remaining only the bare physical property, and causing a financial loss to the mill owners of many thousands of dollars.

There has been made here, no claim on the part of the appellant to any prescriptive or adversary right to any ex-

cess of water used, and we do not give that question any consideration.

Of course, if the meaning of the grants themselves were plain, the language clear and understandable, a judicial construction of them could have been obtained from their "four corners," without the aid of extrinsic evidence. If this were true, then it is quite apparent that the volumes of evidence taken was in vain.

When we advert to the evidence we find the expert hydraulic engineers in disagreement as to the meaning of the terms "inches," "square inches," and "cubic inches" used. They decidedly support the contentions of the respective parties. If the meaning of the grants is plain, the appellee will prevail because, as stated, there is no question raised in the case as to any prescriptive or adversary right to any excess of water that might have been used. If the meaning is not plain and unambiguous, it then becomes the duty of the court to ascertain the meaning of the parties in the light of the surrounding facts and circumstances and the construction, if any, they have placed upon the instruments. Is there doubt about the meaning of the terms used? Can any one state with certainty, from the language of the grants alone, the quantity of water that passed to the grantees and their successors? To read them will conclusively demonstrate that those questions compel a negative answer.

The appellant introduced as expert witnesses, Whitham and Horton. They testified that "inches" or "square inches" of water, at the time the grants were made, had no definite meaning as to the quantity of water intended by the parties to be granted. Witness Whitham said that he had made an exhaustive search of the literature of hydraulic engineering and mechanics, millwrighting and machine works, and prior to 1878 he found no definition of the terms used. He also said that he had consulted many engineers and old millwrights, and to them the terms were meaningless. A little later he said that not even now do mill men consider

the terms to have an established meaning, but perhaps at this time they have an established meaning among engineers; but that they did not know the meaning of "square inches" of water until very recently. He informs us that the meaning of such words has been a fruitful source of litigation and that some courts have construed the meaning one way, while other courts have construed it the other way, but the courts generally, where the question has arisen, have been guided, invariably, by the acts of the parties under the contracts; and that the term "inches of water" must be considered in connection with the grant, and the measure of the grant must be determined by the acts of the parties. He also said that the expression, "inches of water," has practically gone out of existence since 1900, and that now the quantity is expressed in cubic feet a second.

Witness Horton also said that "inches of water" at the time of the grants had no definite or established meaning in relation to water power; that those terms were used with a different meaning, and the draftsmen of such grants did not explain the meaning to the parties; that confusion has arisen because the parties to grants do not appreciate the difference between an aperture grant and a grant of water in terms of inches independent of the type of aperture; that where there is a grant of 1,000 square inches of water, then following the millwrights' custom he may utilize the hydraulic equivalent of that quantity, measured by the custom on the mill wheels; that it is not a specific description or method by which the water shall be drawn or measured.

As opposed to the expert witnesses offered for the appellant, the witnesses, Williams and Reid, two eminent engineers were offered on behalf of the appellee. Neither of these witnesses testified that hydraulic authority afforded or provided any definition of "square inches of water" as of the dates of the grants involved, but, through them, numerous definitions were read into the record, both European and American. Without detailing or discussing

all of this expert testimony, we are of the opinion that the preponderance of the evidence sustains the conclusion that the terms "inches," "square inches," and "cubic inches," as used in the grants here involved, had at the time, no well defined meaning. Ample support for this conclusion is found in the two well considered Wisconsin cases referred to in the appellant's petition, *Janesville Cotton Mills* v. *Ford,* 82 Wis. 416, 52 N. W. 764, 17 L. R. A. 564, and *Jackson Milling Co.* v. *Chandos,* 82 Wis. 437, 52 N. W. 759. The *Janesville Case* holds that water inches had no definite meaning prior to 1860, and the *Jackson Case* holds that they had no fixed and definite meaning in 1882, and of course the grants we are interested in were made long prior to those dates, in fact, the last one was made in 1842. Those cases are authority also for the appellant's contention that in the construction of the grants here, the court may look to the surrounding facts and circumstances and the practical construction placed upon them by the parties. In the *Janesville Cotton Mills Case,* at page 425 of 82 Wis., 52 N. W. 764, 767, this is said:

"It needs no authority to show that if the term had a fixed and definite meaning among hydraulic engineers and millmen at the time it was used, such meaning would prevail, notwithstanding the fact that people ordinarily did not know of such meaning, or even that the parties to the deeds themselves did not know of it. Parties cannot use technical terms with a fixed meaning, and then disclaim such meaning. It is equally clear to our minds that when such alleged technical or trade meaning is an arbitrary one, and not a meaning which the word or words would naturally import, it must clearly appear that the acquired or technical meaning was not the subject of dispute or doubt; that it was well settled and understood, at least among members of the profession or trade which is supposed to use the term in such technical sense. It would relieve us of some labor if we were able to say that the testimony here shows that the term 'square inch of water' had acquired the technical

meaning embodied in the definition of the theoretical inch at the time of the making of the early deeds upon this water power, but we are not able to say so. It is true, there are several water engineers who testify that the theoretical inch has become the accepted meaning of the term 'inch of water,' but they do not attempt to tell when such meaning became prevalent. There were also some pamphlets called 'wheel books,' which are advertisements issued by makers of water wheels, which give the technical definition claimed by respondents; but these have all been issued within a few years last past. There was other evidence upon the same side, but, on the other hand, there was much evidence of practical millwrights, and at least one water engineer, to the effect that such meaning has never obtained or come into general use. The entire testimony on this point forces upon our minds the conviction that there was not in 1850, or even in 1860, a fixed technical meaning attached to the words such as respondents claim."

The *Jackson Milling Company Case,* the other Wisconsin case, announces the same principle. Thus it is seen that the conclusion we have reached in our interpretation of inches of water, in the instant case, finds abundant support in the Wisconsin decision and we are content to rest our decision of the question thereon.

If we were to construe the grants to mean that it was intended to convey 1,000 square inches of water under a pressure or head of four and one-half feet which would flow through an aperture of those dimensions, as contended for by the appellee, we would be compelled to read into the grants language which is not already there, because there is no mention in them of the aperture method. We are unable to accept the position of the appellee that the terms "square inches" or sluices of water, standing alone, would imply that the aperture method was intended. Prior to 1842 the canal owners had full information regarding this method of measurement, and on one occasion used language in one of the grants, other than those here considered, in which

the aperture method was expressed plainly. Regardless of what the meaning of a sluice may be, the evidence fails to show that it meant an aperture in 1791 when the term sluice was used, and, if it did, then it would apply to only 105 square inches of water for that was the only quantity conveyed in that grant.

Another significant fact is that the engineers testified that there were different types of apertures—some square, some rectangular and some circular—and it seems that a different quantity of water under the same pressure would flow through each of them. The question would arise (if we adopt the construction sought by the appellee that an aperture was implied), what kind of aperture would be implied? The standard aperture is defined by the experts for the appellee to be one cut in thin steel of the desired dimension, with sharp edges, while the experts who testified for the appellant said that the edges, as shown by the practice of millwrights, were beveled and that a much larger quantity of water would flow through a beveled-edged aperture then a square-edged one. Therefore, if we read into the grants the aperture method, we must go a step further and read into them the type of aperture—that is, whether square, rectangular, etc.—all of which forces us to the conclusion that we cannot accept the position of the appellee that square inches of water, under a certain pressure, standing alone, implies the aperture theory.

The expert testimony of the appellant, going a step further, touching the meaning of the grants, supports the contention advanced, that under the grants the mill owners were entitled to a sufficient supply of water to operate the Gallego Mill. In supporting this contention, witness Whitham said: "I think it was enough water power to produce a result, and the people who were buying the power were practical people, using the power, and they were producing results—product in a mill. Both parties knew what the power was to be used for, both parties were aware where it was to be used. I think their minds were

together on the quantity of power necessary to produce the work and drive that equipment in that property. I think there is no doubt their minds were thoroughly together and in harmony and that the operation of the mill in pursuance of the lease was an expression of the minds of the parties." Witness Horton testified substantially to the same effect. The experts of the appellee were not in accord with this view. All the way through they have maintained the theory that the grants were of apertures. Witnesses Whitham and Horton, in support of their view that the mill owner was entitled under the grants to sufficient power to operate the mill, call attention to the fact that measurement of the water by an aperture is not mentioned in any of the grants; that it has never been taken in that way; that a sufficient quantity had always been supplied; and that the grant of 1842 expressly contemplated that sufficient water power for the purpose of operating the mill was intended. The grant of 1842 has been set forth herein. It provides among other things that "so much of the 500 inches of water, herein granted, as may be required with the 500 inches of water now leased, at the Gallego Mills to drive the machinery at the said Gallego Mills, as at present constructed, but to be taken under the same limitations and restrictions, as the water herein granted is to be taken under at the Rutherford Mills. * * * the above phrase, 'So much of the 500 inches of water, herein granted, as may be required with the 500 inches of water now leased, at the Gallego Mills to drive the machinery of the said Gallego Mills as at present constructed,' it is only intended to indicate the quantity of water which may be transferred from the Rutherford Mills to the Gallego Mills under this covenant and not to authorize the James River and Kanawha Company to interfere with any changes which the present or any future proprietors of the Gallego Mills may make, in the machinery thereof provided the quantity of water used is not thereby increased."

■ As opposed to the appellee's theory that the terms "inches," "square inches" and "cubic inches" all meant square inches, under a certain head, and in and of themselves necessarily implied an aperture grant, though not so expressed in the grants, the evidence shows that very early in the history of the canal the directors and officers of the canal knew of aperture measurements, and in 1801 actually granted water in connection with the operation of another mill by aperture, and that in 1838 they considered the advisability of adopting this method in connection with the sale of water. They authorized their chief engineer to make experiments of measuring water through apertures, and in his report to the canal company he recommended, in 1839, a form of aperture, and rules and tables were submitted for determining the quantity of discharge through rectangular apertures. And yet in the light of all of this information the canal owners made the deed of 1842, granting the water in square inches, but making no provision therein for any aperture or orifice. Surely if the canal company had intended the deed of 1842 to be an aperture grant it would have expressly so provided, but this was not done. There being abundant evidence, showing clearly that the canal owners were familiar with apertures, and not having expressed this idea in their deed of 1842, the inference is that they rejected this method, for it appears that they never subsequently used it.

Some important considerations preceded the execution of the grant of 1842. The original mill was built in 1835 on the foundation upon which the present mill now rests. It then was an extensive plant of its kind for that day and time, using a considerable volume of water, and had been in operation for seven years before the deed of 1842, the last grant made. During those seven years the extensive business, the power requirements and capacity of the mill were known to the canal owners from whom the water was obtained. During that time disagreement arose between the parties about the water supply. The chief engineer of the

canal company made an unsuccessful attempt to restrict the supply of water by placing some kind of a fixture at the point of intake. This brought about dissatisfaction on the part of the mill owners and resulted in their appearance before the board of directors of the company where their grievances were aired and apparently adjusted. Later the mill owners decided to make provision for a larger supply of water, presumptively, for the purpose of finally settling the water difficulties and differences and adjusting them. No doubt, such a result was welcomed by both the mill owner and the canal owners. At this time and before the deed of 1842, the canal owners had had their engineer experimenting with the different kinds of apertures, and an attempt to measure and regulate the supply of water to the consumers on the canal had met with failure. The engineer had also been directed to report the best type of water gate to be adopted that would afford some basis for calculating the volume of water to be used in connection with future sales of water. The mill owners and the canal owners, knowing the power requirements of the mill and the purpose for which the additional water was desired, and the mill owner being aware of its claim to use and its use of more water than the canal company contended it was bound to supply, and the canal company being aware of the constant friction caused by their inability to settle their trouble, which seems to have been a *bona fide* dispute between them as to the quantity to be supplied and received, they entered into the agreement which was closed by the deed of 1842, in which no mention is made of any type of aperture or other method for measuring the water. In fact, no provision whatever is made in this deed for any means of measuring the water. These circumstances strongly indicate that the parties did not negotiate with reference to any mode of measurement, such as an aperture, which was about that time and before subject to the experimentations of the chief engineer of the company. The circumstances point strongly to the conclusion that the water was being granted for the purpose

of furnishing power to operate the mill, and when all the circumstances are considered along with the language of the deed of 1842 which closed all prior negotiations, and which, by fair inference, was intended to end all water troubles, we are driven to the conclusion that it was intended by the parties, speaking through the deed, to grant to the Gallego Mill owners power to operate the mill as then constructed. If the parties, by that deed, did not mean and intend the grant to be one of power, then there is no other reasonable construction which can be placed upon it without doing violence to the language therein or without reading into it important language which is not already there.

The preponderance of the evidence shows convincingly that the Gallego Mill, certainly from 1842 until 1923, received, and the canal owners supplied, a sufficient quantity of water to operate the mill.

It is a well known principle in the construction of contracts that the object of the court is to discover and give effect to the intention of the parties.

In *McGuire* v. *Brown,* 114 Va. 235, 76 S. E. 295, 297, the court said: "Regard should be had to the intention of the parties and such intention should be given effect. To arrive at this intention regard is to be had to the situation of the parties, the subject matter of the agreement, the object which the parties intended to accomplish. A construction should be avoided if it can be done consistently with the tenor of the agreement, which would be unreasonable or unequal, and that construction which is most obviously just is to be favored as most in accordance with the presumed intention of the parties."

There are many other authorities which support this view, but we deem it necessary to cite only a few of them, as the principle is universally recognized.

In *Bridgewater, etc., Corp.* v. *Fredericksburg Power Co.,* 116 Va. 333, 82 S. E. 173, 175, Ann. Cas. 1916D, 1027, the court said: "In construing written instruments regard must be had to the situation of the parties, the subject mat-

ter of the agreement, and the object which the parties had in view at the time and intended to accomplish. When these principles are supplemented by the further rule that the intention of parties to a deed must be gathered from the language used, and this language, in case of doubt, must be taken most strongly against the grantor, the conclusion cannot be avoided that the terms of the grant under consideration negative the idea that defendant company was compelled to keep its own dam, on its own land, eighteen feet high no matter how imperative the necessity for increasing the height might be. The language relied on by the complainant does not control or limit the height of the dam, nor does it control or limit the defendant's use of the water power, but it is itself controlled and limited by the use which the company may make of the water power for its purposes."

In *Chesapeake & Potomac, etc., Co.* v. *Wythe Mut. Tel. Co.,* 142 Va. 529, 129 S. E. 389, 392, the court said: "In the construction of contracts, the rule is stated by Judge Burks in *Bank of Old Dominion* v. *McVeigh,* 32 Gratt. (73 Va.) 530, as follows: 'As said in the opinion in *Talbott* v. *Richmond & Danville R. R. Co.* (3 Va. Law Journal, 486), to ascertain the intent of the parties is the fundamental rule in the construction of agreements (*Canal Co.* v. *Hill,* 15 Wall. 94, 21 L. Ed. 64) ; and in such construction, courts look to the language employed, the subject matter, and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and in that view they are entitled to place themselves in the same situation which the parties who made the contract occupied, so as to view the circumstances as they viewed them, and so to judge of the meaning of words and of the correct application of the language to the things described.' "

Another well known principle applied in the construction of deeds is that the deed is construed most strongly against the grantor and in favor of the grantee, and in 8

Ruling Case Law, page 1051, section 104, it is said: "This rule has been called one of the most just and sound principles of the law, because of the fact that the grantor selects his own language, and it is statutory in some jurisdictions, as where the statute provides that grants shall be construed like contracts, and contracts shall be construed against the person responsible for any uncertainty. If, therefore, the deed can inure in different ways, the grantee, it is said, may take it in such way as will be most to his advantage."

In the construction of contracts in which obscurity exists, great weight is given by the courts to the acts of the parties done under the contracts, as an indication of their intention. This is known as the rule of practical construction. *Bridgewater, etc., Corp.* v. *Fredericksburg Power Co., supra; Citizens' Bank* v. *Taylor,* 104 Va. 164, 51 S. E. 159; *Holland* v. *Vaughan,* 120 Va. 324, 91 S. E. 122; *Chick* v. *MacBain,* 157 Va. 60, 160 S. E. 214; *Janesville Cotton Mills* v. *Ford, supra; Jackson Milling Co.* v. *Chandos, supra.* Applying the rule of practical construction which involved the construction of water grants in the *Janesville Case,* the court said: "It is well settled that the practical construction placed by the parties in interest upon doubtful or ambiguous terms in a contract will exercise great and sometimes controlling influence in determining the construction, and such rule is founded upon manifestly just principles."

The evidence shows, as we have seen, that for these many years the canal owners have known at all times that the mill owners were drawing from the canal sufficient water to operate the Gallego Mill, and that it was greatly in excess of the 83.8 cubic feet per second which the canal owners claimed was the correct quantity; and that the mill owners have paid and the canal owners have accepted compensation for the water used according to the construction placed upon the grants by the mill owners, during all those years, the canal company never having protested or attempted to require payment for any claimed excess water

used. This strongly indicates that for practical purposes, even though the appellee now maintains and has maintained that 83.8 cubic feet per second is all the water, under its construction, to which the mill owner is entitled, it nevertheless by its conduct in accepting compensation for the water without protest and with full knowledge of the claimed excess use, abandoned its original construction and accepted that placed upon the grants by the appellant.

The trial court, as we have seen, based its decision of the case solely upon the principles announced by this court in *Stearns' Ex'r* v. *Richmond Paper Mfg. Co., supra*. The appellee claims that the *Stearns Case* is decisive of the case at bar and that it establishes the grants involved here as aperture or orifice grants. It claims further, that even if the *Stearns Case* is not controlling, the grants here, as shown by the evidence, independent of that case, are aperture or orifice grants.

In the *Stearns Case* a bill was filed in 1881 in the Chancery Court of the city of Richmond by the Richmond Paper Manufacturing Company against Stearns' Executor, the purpose of which was to enforce payment for rent of water rights which were appurtenant to certain real property of the estate, and to have an adjudication of the extent of the water rights and privileges pertaining to said real estate. The water rights referred to arose under a grant in 1834 from the James River Company to the Franklin Manufacturing Company which specified 100 square inches of water under a head or pressure of four and one-half feet with an option of not more than fifty square inches additional at a similar pressure. Stearns became the owner of the real estate to which the water rights were appurtenant and as such had the right to use 150 square inches of water. Subsequently, the Richmond Paper Company, the appellee, which was the successor in title to Stearns' grantor, finding the supply of water under the grant inadequate, purchased a larger supply of water and agreed to pay for the same a greater rent, and Stearns in turn was furnished this

increased supply of water and claimed that he was entitled to it, without the payment of the additional rent.

The contention of Stearns is found in the following language taken from the opinion at pages 1035 and 1036 of 86 Va., 11 S. E. 1057:

"The evidence was taken in the cause, and the contention of the plaintiff company was that, by the terms of the original grant, the supply of water to which the defendant was entitled, as the owner of lots Nos. 5 and 7, was limited to one hundred square inches of water, at a pressure or head of four and a half feet; and for this a rent of $600 had been reserved, of which the owner of lots Nos. 5 and 7 was to pay one-half, the $300 demanded, with an option of not more than fifty square inches at a similar pressure; that the plaintiff, finding this grant wholly inadequate, when it came to be accurately measured, had purchased a larger supply of water than the said one hundred and fifty inches, and agreed to pay for the same, a much greater sum as rent; that the said defendant received this increased supply of water, and claimed the right to do so without the payment of the additional rent, or any part thereof; the defendant claiming, as to this, that the supply of water alleged to have been purchased by the plaintiff, in excess of the said one hundred and fifty inches, was the same supply, and no more, than the said defendant and his predecessors had been receiving for more than forty years, and that, if more than that was granted, it had been delivered for more than fifty years, and the right to this quantity had grown up by prescription, and, by adversary possession, he and his predecessors had a title to the water which flowed, and had flowed, for this time, and he was protected from the claim of the plaintiff by the statute of limitations, limiting the entry on or action for real estate."

From this it is seen that the real issue in that case was whether Stearns had acquired by prescription or adversary possession title to the excess water.

Following that statement of the issue in the case the court then recited the proceeding in the lower court:

"The chancery court of the city of Richmond, at the hearing, was of opinion, and decided, that the defendant, as the owner of lots Nos. 5 and 7, mentioned in the proceedings, was entitled to receive twelve cubic feet of water per second, being the equivalent of one hundred and fifty square inches of water, through the present course or channel, and decreed that the plaintiff, the Richmond Paper Manufacturing Company, its successors and assigns, should, at all times, permit the said twelve cubic feet per second of the water flowing to their premises to flow to the said lots (Nos. 5 and 7) without obstruction in the course or channel in which the water now flows to the said lots; and that the said defendant was not, either as owner of said lots Nos. 5 and 7, or otherwise, entitled to receive from the Richmond Paper Manufacturing Company, its successors and assigns, any water now or hereafter flowing to their premises, in excess of the quantity thereinbefore specified and decreed; but that, as to any such water in excess of the quantity before specified and decreed, the Richmond Paper Manufacturing Company, its successors and assigns, should have the right, at all times, to divert such excess of water, and to use the same as their own, free from any claim of the defendant, and decreed that said lots (Nos. 5 and 7) should be subjected to the payment of the said water rent demanded, as due and in arrears; and, in default of the payment of this sum on or before the 1st day of May, 1889, following, decreed a sale of the said lots, or so much as should be necessary to pay the said sum in arrears for rent due and unpaid. From this decree the defendant applied for and obtained an appeal from one of the judges of this court."

From the opinion it appears that this court affirmed the lower court in its holding that Stearns was entitled to receive twelve cubic feet of water per second, which was held to be the equivalent to 150 square inches. The court stated (page 1039 of 86 Va., 11 S. E. 1057, 1059): "That it be-

coming apparent that it was an impossibility to deliver this water at the specified head or pressure, a controversy arose between the millers and manufacturers on the Richmond level, on the one hand, and the canal company on the other, as to the quantity of water to which the former were entitled under their contract with the James River Company, and in 1837, the James River and Kanawha Company, the successors of the James River Company, applied gates to the different establishments, limiting them to the exact quantity of water to which they were respectively entitled; that this action was acquiesced in by the Franklin Company and the James River Company and its successors, for a period of forty-four years, without any attempt on the part of any party to disturb this practical settlement of the rights of parties under the contract of 1834."

And again the court said (pages 1040, 1041 of 86 Va., 11 S. E. 1057, 1060): "That although Franklin Stearns, in his answer, claimed that he was not getting more than the agreed quantity of water, it has since been proved otherwise, and is now admitted; that when the deed of 1834 was executed, none of the parties had any adequate conception as to how much power one hundred square inches of water, under such pressure, would produce, and that such quantity of water was not worth then, under present prices, fifty dollars per annum; that Franklin Stearns held and used this water, without hinderance for all the years until 1880, when the Richmond Paper Manufacturing Company, the appellee, and the successors of the Franklin Manufacturing Company, made a compact with the Richmond and Alleghany Railroad Company, the successor of the James River and Kanawha Company, by which they made a new contract for water supply, in which the stipulation was inserted, by which the latter had the right, upon three months' notice, to require the Richmond Paper Company to divert the water flowing from the Richmond Paper Company's mill away from the Stearns property, lots 5 and 7, and the lots lying to the south of them; that Stearns

was no party to this, and was not bound by it; that upon the demand upon Stearns for the $300 for the rent for one hundred square inches of water, he refused payment, upon the ground that he was entitled to all the water which flowed from the said paper mill, and not simply to the one hundred square inches of water, by reason of his ownership of lots Nos. 5 and 7, and the lands lying south of them, derived from Hall Neilson.

"It thus appears that it is conceded that, by original grant, the Franklin Manufacturing Company was entitled to the one hundred inches of water, and the option of fifty more; that the grantee of the said company, the Broad Meadow Company, was to receive the same. But it is contended that as this was inadequate, and is still inadequate, the appellant is entitled, by reason of long use, to the larger supply, without paying a larger sum than was originally agreed to be paid for the smaller and inadequate quantity, and this because the contract for the supply of water was a covenant running with the land in the hands of Neilson and his successors.

"The right of the appellant to the one hundred inches, and the option of fifty inches additional, is not denied by the appellee, but conceded. But the appellant company, finding, upon investigation, a fact which is now conceded by both sides, that the amount of water to which it was entitled under its contract, by which it held its water rights, was insufficient for the purpose for which it was wanted, made a contract for a greater and a sufficient quantity at an increased price, and now insists that the appellant, if he has the benefit of this increased supply, must contribute his one-half of the cost of the same, under the deed of November 6, 1846, by which lots Nos. 5 and 7 were granted."

And again on page 1043 of 86 Va., 11 S. E. 1057, 1061, the court said: "And no other and no greater easement was claimed in the answer and cross-bill of the defendant, and it was only after the testimony of expert witnesses had been taken, and the true magnitude of the flow settled to the

satisfaction of all parties, both plaintiff and defendant, that the claim is set up that the granted flow of water was inadequate, and that, as more had always flowed than what was granted, a new right had been acquired. This may be true; but if true, the defendant did not know it at the time he filed his answer and his cross-bill. He claimed then, and, indeed, always did claim, a right such as was granted, and never at any time asserted any claim inconsistent with the terms of the deed, and there appears to have been no adverse user or enjoyment claimed at any time inconsistent with the deed."

It appears from the opinion that the adjudication that 150 square inches of water was equivalent to twelve cubic feet per second was based on conceded and undisputed facts, for the court said: "It was only after the testimony of expert witnesses had been taken and the true magnitude of the flow settled to the satisfaction of all parties, both plaintiff and defendant, that the claim is set up that the granted flow of water was inadequate and that as more had always flowed than what was granted, a new right had been acquired." From the record in that case Stearns' executor took the position that the interpretation of square inches of water as contended for by the Richmond Manufacturing Company was the correct one. Both in his answer in the trial court and in his petition for an appeal he claimed that 100 square inches of water under a head of four and one-half feet was equivalent to eight and one-fourth or eight and one-third cubic feet per second and that 150 inches under the same head would be equivalent to twelve cubic feet per second, and to support this proposition he introduced the only expert witness in the trial court who testified that 150 square inches equaled twelve cubic feet per second. This was a conceded fact, not only not denied by either party, but consented to by both of them. There was no contest or dispute as to the interpretation of the water grant involved. Both parties advocated the construction which the court placed upon the grant.

There are many substantial differences between the *Stearns Case* and the case at bar. Some of them will be shown.

In the *Stearns Case,* the adjudication was upon undisputed, conceded facts. Here every fact is in dispute and nothing conceded. There the court simply adopted the construction that both parties had themselves placed upon the grant and contended for. Here the parties are contending for entirely different interpretations. The meaning of the terms and extent of the water conferred under the grants here, if ambiguous, are to be determined upon the evidence in this case. In that case there was not the question of the elimination of the basin or pond nor the obstructions which are claimed to have reduced the water supply here. There was no question in the *Stearns Case* about the loss of the pressure under a four and one-half foot head which is shown in the instant case. In the instant case, we have the deed of 1842 to consider, which is peculiar to this case alone and absolutely foreign to the *Stearns Case.* Here we have the destruction of a large mill with extensive operations to consider which was not involved in that case. There the principle issue in the case was whether an adversary or prescriptive right had been acquired to the excess water by reason of the long use—more than twenty years. The construction of the grant was a secondary or incidental question in the case. Here the construction of the grant is the principal question. There is here no contention for any prescriptive right. These differences show that the *Stearns Case* is not controlling in the instant case, and that the rule of *stari decisis* has no application.

The cases outside of Virginia relied upon by the appellee are distinguishable upon the facts. In *Paddack* v. *Pardee,* 1 Mich. 422, the main question involved was the point where the water should be taken. The question of whether it should be taken through an aperture was not pressed. In *Schuylkill Navigation Co.* v. *Moore,* 2 Whart. (Pa.) 477, the grant was an express aperture one. The grant pro-

vided expressly that the water was to be taken through "two apertures, one fifty square inches and the other 250 square inches * * *." Likewise in the case of *Norris* v. *Showerman,* 2 Doug. (Mich.) 16, the grant was "so much water as will run through an aperture of two feet square * * *." In *Torrance* v. *Conger,* 46 N. Y. 340, "375 inches of water under a thirteen foot head" was granted but the court failed to construe the language. In *Emery* v. *Common Council of the Village of Three Rivers,* 78 Mich. 438, 44 N. W. 401, 402, the grant expressly provided that the quantity should make a "stream of water filling an opening fifteen inches square." In *Forrest Milling Co.* v. *Cedar Falls Mill Co.,* 103 Iowa 619, 72 N. W. 1076, the court failed to construe "inches of water."

But the appellee claims that by reason of changes in the machinery and equipment and the enlargement of the mill, a greater quantity of water is needed now than was formerly required. The appellant replied that it is true the machinery was completely changed in 1903, but with the improved machinery then installed the consumption of water was decreased, and from that time on no more water was required than was needed before then. Some of the experts testified that the new machinery would not require quite as much water for operation as the old. The evidence of some of the witnesses shows that there was no enlargement of the mill. The millers who actually operated the mill, beginning in 1878, testified that they did not use quite as much water after the installation of the new machinery. Several ancient records were introduced to show that the size of the mill from 1834 to the present time has not increased. Thomas, the miller, said that he saw the plans of the old mill as it was prior to 1865, and they showed that the mill was substantially the same size then as now. This would carry it back to the time of the rebuilding after the fire of 1846, as both Thomas and Lockett, the other miller, testified that there has been no substantial change, since they started to work there about 1878, down to the present, which would

require more water than was required in the early history of the mill. So we think the evidence shows that the mill dimensions on the present site have been substantially the same, certainly since 1846, and since that time there has been no substantial increase in water requirements. Prior to 1878, from the reports and the records kept by the canal owners covering the period from 1858 to 1927, it is shown that during all of that time, while the measurements naturally have varied, the lowest the mill owners have received was 123 cubic feet per second while the highest was 221 cubic feet per second. The appellee for a great many years, has claimed, as we have seen, that the Gallego Mill was only entitled to 83.8 cubic feet per second which was arrived at under the aperture theory.

Certain facts and circumstances which lead us to the conclusion we have already reached, that 83.8 cubic feet per second is not sufficient power to operate the mill, briefly, are the capacity, according to custom, of the requirements of like machinery and equipment, such as the water wheels, mill stones and the output of the mill both under the old wheels and the new ones, and the computation of experts who have fixed the water requirement of Gallego Mill at 173 cubic feet per second. In fact, the measurement of water by cubic feet a second was not known until 1840 or 1850, and this is a very good reason to conclude that such method was not contemplated by the parties when the grants were made.

The first time we find the water (as contended for by appellee) specified as 83.8 cubic feet per second is found in the records of the canal owners. It was computed in 1858, but at the same time the records show that the mill was using 149.4 cubic feet per second. At that time it had been sixty years since the first grant was made and about sixteen years since the last one. However, no notice of this computation was given the canal power until 1891, which was after the appellee acquired the canal and the mill had been in operation fifty-five or sixty years. Later in 1876, the en-

gineer of the canal owner computed the supply under the grants as 73.83 or 82.68 cubic feet per second depending upon the coefficient used.

As stated, the appellant is claiming that it requires 173 cubic feet per second to operate the mill, and his experts support the contention with testimony. Experts for the appellee say that the mill can be operated on much less water. How will the court arrive at the quantity in cubic feet per second that has been and is now necessary to run the mill? The only practical and most accurate method, which occurs to us of ascertaining the number of cubic feet per second necessary, is to compute it from the output or capacity of the mill. For a great many years even prior to 1865 this has varied from 1,000 to 1,500 barrels per day. Now it has been ascertained from the expert witnesses that a daily output of 1,400 barrels would require the use of 536 horse power, which is equivalent to 172 cubic feet per second. An output of 1,200 barrels of flour and 1,200 bushels of meal daily would require about the same number of cubic feet per second. Another expert testified that prior to 1865, considering the size of the mill and its equipment and output, 168 to 173 cubic feet per second, or 520 to 536 horse power, would be required. The millers who operated the mill which was rebuilt in 1865 upon the same old foundations and which had not been substantially changed since 1846, and who were men of wide practical experience in milling, confirmed the experts' testimony in this respect. In accordance with this evidence we are justified in concluding that the water requirement of the Gallego Mill is 173 cubic feet per second.

The various measurements of water differ widely. It occurs to us that this difference may be due to the fact that the water was measured in different places in the canal. Another fact in this connection is the great difference in the coefficient of discharge used by the several engineers in making their computations. It is apparent from the evidence that in computing the volume of water, by a formula,

there is a variance in the result according to the coefficient or percentage of discharge used. Some of the experts testified that the difference is a wide one. The coefficient of the standard orifice appears to be about sixty-two per cent, while the coefficient used by some of the experts was seventy-one per cent. This, of course, would account for the results so widely differing. It is upon a coefficient of seventy-one per cent that the canal owners have computed the water required under the grants as 83.8 cubic feet per second. The appellant claims that, in any event, the coefficient should have been eighty per cent to ninety per cent instead of seventy-one per cent, and even if the appellee's claim that the grants were apertural were true, they would be entitled to a great deal more water than 83.8 cubic feet per second. The appellee admits that in the measurement made by its predecessors from 1858 to 1872, the coefficients were evidently guessed at. But aside from this technical evidence we have, as already stated, the testimony of witnesses who were practical millers and who have for many years known the water requirements of the mill, and upon their evidence and upon the output of the mill we prefer to establish the quantity of water necessary to operate the mill and to which the appellant is entitled.

It is practically undisputed that the mill cannot now be operated upon the water supplied by the appellee. The evidence shows that on account of insufficient water the mill was forced to close in 1923; that an unsuccessful effort was made to operate it in 1924, and that another effort was made in 1927 which also failed because of insufficient water. Appellee's contention is that 83.8 cubic feet per second is all that it is required to furnish, assuming the grants to be apertural, but it is quite clearly shown that this quantity is not sufficient to operate the mill. The appellant claims that even this quantity of 83.8 cannot now be supplied from the canal on account of the obstructions which have been placed in it and the filling up of the basin by the appellee. Witness Horton said that it was now impossible to maintain a steady

operation of the mill and that only seventy cubic feet per second can now be utilized under a greatly reduced head on account of the elimination of the basin and the obstructions placed in the canal. Another difficulty about the Gallego Mill obtaining the necessary water required is the fact that the Tredegar Iron Works, whose plant is just above the Gallego Mill, used such a large quantity of the water that this results in greatly reducing the supply and the head at the Gallego Mill. Mr. Thomas, the miller, who was long in the service of the appellant, said: "If Tredegar starts a wheel now it pulls our head down and we have white water there in less than an hour." Appellee's witness, Williams, said that the Tredegar Iron Works was using over three times as much water as it was entitled to under its leases, and this witness also said that the Gallego Mill could not now be operated on the water supplied.

The evidence shows satisfactorily that from 1923 until after trial of this case was begun there was an insufficient supply of water to operate the Gallego Mill; that the reduced supply was caused by the appellee in placing the obstructions in the canal; in destroying the basin or pond from which it was agreed that the water should be drawn and in the great quantity of water used by the Tredegar Company when it is in operation. The basin or pond was in existence when the deeds of 1834 and 1842 were made, and the parties, as shown therefrom, contracted with reference to it. It ceased to exist in 1907, having been completely obliterated. At the time it was being filled in and covered over, the appellant made complaint to the appellee that the water supply would be impaired thereby, but the appellee gave assurance that there would be no impairment of the supply. The purpose of the pond was to secure an even flow of water to the mill at the proper head and it served this purpose until 1907. Its size was approximately 150 feet by 300 with an area of some 312,000 square feet, and the depth averaged some four or four and one-half feet. Certain maps filed in the cause show the obstructions which have been placed in the canal

and that the canal has gradually become narrower just above the Gallego Mill, and this has had effect upon the bed and flow and reduces the head. The evidence shows that in the stretch just above Gallego Mill the water supply in the canal has been substantially reduced. All of these caused the reduced supply to Gallego Mill and greatly reduced the head, resulting in the forced closing of the mill.

Appellee points out that the mill owners on the present location had a fall of sixty-seven feet but have failed to properly utilize it and are using only thirty-four feet of it, while if they had used the entire fall there would have been sufficient power, but the appellant replies that the entire fall could not have been economically used, which we think answers this contention sufficiently.

Certain evaluations of the water supply to the mill were made from time to time by the appellee and its predecessors, and from this it is claimed that the appellant and his predecessors acquiesced therein. Through these evaluations the water to which the mill owners were shown to be entitled was much less than the mill owners were using. These evaluations are embraced in certain reports made to the canal owners many years past. It is not shown, as we have already stated, that the mill owners had any knowledge of them prior to 1891, which, as we have seen, was some sixty years after the mill had been in operation at the present site. From certain other reports and records which were in the possession of the canal owners, it is shown that there was considerable disagreement between the parties as to the quantity of water the mill owners were entitled to, but the evidence shows that the prior mill owners and the present owner always claimed and received enough water to operate the mill. In 1891 the appellee, through its chief engineer, wrote the then owner of the Gallego Mill that it had been definitely determined some years prior that the mill was entitled under the grants to only 83.8 cubic feet per second, and that consumption by the mill was largely in excess of that quantity. The letter concluded that the

mill owner must not exceed that quantity. Numerous other letters followed to the owners of the Gallego Mill, and in them the quantity of water to which they were entitled was claimed to be 83.8 cubic feet per second, and it was also insisted that the use of the water must be limited to that amount. The correspondence extended to 1923 with considerable intervals of time intervening. For instance, from 1892 until 1900 there does not appear to have been any correspondence; then, in 1902, the matter was again brought up and carried on at intervals until 1912. It again appears to have been taken up in 1921 and in 1923.

The appellant, Warner Moore, testified that the files of the milling company were destroyed by fire several years prior to the time of this litigation and, as a consequence, all of the records and letters touching this matter could not be produced, but a letter was written the appellee in 1902 asking it to advise just how much water the appellant was entitled to under the grants according to its (appellee's) construction of those instruments. The appellee advised that it considered the Gallego Mill entitled to 83.8 cubic feet per second. Later, in 1902, the appellant wrote the appellee emphatically denying that it was using any excess of water over and above the quantity the grants gave the mill. Attention was called to the changes being made in the canal and basin. This appellant further testified that there was trouble about the supply of water from the time the mill was bought and that they had always claimed to be entitled to sufficient water to operate the mill. He stated that the machinery of the mill had never been enlarged so that an additional quantity of water was needed and that he had never assured the appellee that they would limit their use of water to 83.8 cubic feet per second but on the other hand he had always claimed enough water to operate the mill. Appellant introduced a letter from the engineer of the appellee written in 1911, in which an adjustment of appellant's claim, that he was not getting sufficient water, was offered to be made by deducting $200.00 from the rental due Jan-

uary 1, 1910, to cover the deficient water supply. It was also stated in the letter that Mr. Moore had raised objection to covering the basin, stating that it might injuriously affect the supply of water. Thus, it does not appear that the mill owners acquiesced in the contention of the canal owners that the Gallego Mill was entitled to only 83.8 cubic feet per second. The Crozet report and the other reports made to the canal owners touching this subject were not known to the mill owners. They have always claimed a supply of water sufficient to operate the mill, and until 1923 they received it. All of this strongly indicates that the canal owners acquiesced in the contention of the mill owners and yielded to their construction of the grants. In support of this conclusion is this circumstance: For a great many years the canal owners had in their employ a "water tender" whose business it was to keep the water up, and when the mill operator found it was being reduced he would, according to their practice, complain to the water tender and he would promptly correct the deficiency.

Our conclusion, therefore, is that "square inches of water" and other terms in inches, used in the grants by the parties, cannot be construed as aperture or orifice grants; that the grants must be construed in the light of the surrounding facts and circumstances, and the practical construction placed thereon by the parties; that when so construed, it is evident that the meaning of the parties to the grants was that the Gallego Mill should be furnished sufficient water to operate the mill as "then constructed;" that such quantity of water is fixed and established as 173 cubic feet per second; that there has been no material enlargement of the mill since the deed of 1842, which would require any substantial increase in the water supply; that sufficient water to operate the mill has not been furnished by the appellee since prior to its closing; that the cause of the inadequate supply is the obliteration of the basin or pond and the obstructions placed in the canal, for which the appellee is responsible.

■ The appellee contends that the instant case is not one in which specific performance should be decreed, because if appellant's construction of the grants is accepted then the grants are not certain and definite in their terms which is usually fatal to such a suit. Of course, the trial court, by overruling the demurrer, necessarily held that the case was a proper one for specific performance. The answer to this is that the grants sought to be specifically enforced, if originally indefinite, are not now indefinite and have not been since the rights of the parties were settled by their own construction of them. We think it beyond serious question, that the record here presents a case for specific performance, and so conclude. A great many authorities can be found, both within and without this jurisdiction, which amply support the principle. We think the cases referred to in appellant's petition are sufficient for the purpose. 25 R. C. L., page 283, section 86; 27 R. C. L., pages 1235-1240, sections 145, 147 and 149; 35 Cyc. 554; 40 Cyc. 745; *Shenandoah Valley Ry. Co.* v. *Lewis,* 76 Va. 833; *Tidewater Ry. Co.* v. *Hurt,* 109 Va. 204, 63 S. E. 421; *Stuart* v. *Pennis,* 91 Va. 688, 22 S. E. 509; *Bassell* v. *West Va. Cent. Gas Co.,* 86 W. Va. 198, 103 S. E. 116, 12 A. L. R. 1398; *Edwards* v. *Moundsville Land Co.,* 56 W. Va. 43, 48 S. E. 754; *Johnson* v. *Ohio River R. Co.,* 61 W. Va. 141, 56 S. E. 200; *Dorsett* v. *Black Hills Traction Co.,* 30 S. Dak. 420, 138 N. W. 808, Ann. Cas. 1916A, 846; and *Jackson Milling Co.* v. *Chandos, supra.*

The question of damages which may be decreed as incidental to the decree for specific performance will be sent back to the trial court with the direction that that question be settled by a jury under an award by that court of an issue out of chancery.

■ We have concluded that the trial court did not err in striking out the special plea of the five-year statute of limitations. It appears quite clearly that the statute has no application to the instant case. This contention is so completely refuted in the reply brief of counsel for the appellant

that we are satisfied to quote therefrom and base our conclusion upon it:

"The position taken in the brief is this: This case, brought by one of the parties to enforce continuing and perpetual rights under contracts which are being violated by the other party, is parallel with a case of a permanent and continuing nuisance, and, therefore, subject to the five year statute of limitation that may be applicable under the facts to such last-named case. In other words, the mill owners here occupy the same status, to take a common instance, as one, having the benefit of no contractual relations, who claims damages, suffered through a long period, more than five years, against a railroad company because of the backing up of water on the plaintiff's land, or it may be because of injury arising from harmful and offensive conditions of operation, such conditions in either case being of a continuous and permanent nature.

"This statement of this matter supplies the answer. There is, of course, no such parallel. There is no application of the five year statute of limitation here. This suit rests on grants by deed under seal, creating obligations on the appellee and its predecessors which are to be performed every year, day and hour, and do not end. The violation of obligation here complained of—there being no question of abandonment, estoppel, or adversary claim, even if there could be the latter—is as fresh and in date and open to redress by court action today as in 1918 or 1923, or when this suit was brought.

"The acts alleged and proved to which the violation of obligation is traced—obstructions in the canal and the filling up of the basin, with the resultant loss and impairment of the requirements and conditions of water power supply— are not to be regarded in themselves as separate and distinct injuries of a tort or nuisance character, independently of the contractual obligation existing. This is not a tort action. To repeat, it is a suit complaining of a violation of per-

petual covenants under deeds and asking that compliance therewith be enforced.

"It is unnecessary, therefore, to review or mention the well known series of Virginia decisions referred to in the brief for the appellee. They have no pertinence to this case."

The decree of the trial court is reversed and the cause is remanded with directions that a decree for specific performance of the grants as construed herein be entered by the trial court granting the appellant the relief prayed for in the bill, except that the damages sustained by the appellant for the forced closing of the mill in 1923 shall not be decreed until after they have first been ascertained by a jury, upon an award of an issue out of chancery by the trial court for such purpose.

*Reversed.*

HOLT and EPES. JJ., dissenting.